[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 889 
S.K. ("the father") appeals from a judgment terminating his parental rights to his three children: C.K., a 12-year-old son; K.K., a 10-year-old daughter; and G.K., a 9-year-old daughter. The judgment also terminated the parental rights of the children's mother, C.L.K., who has not appealed.
The father is a 37-year-old, 9th-grade dropout who has held a variety of manual-labor jobs. At the time of trial, he was earning $10 per hour as a landscape foreman at Cole Farm and Landscape Company. The parents married in 1991. The mother, who suffered from depression and had difficulty coping with the children, did not work outside the home. In June 2003, the Madison County Department of Human Resources ("DHR") received a child-abuse-and-neglect ("CAN") report with the following allegations: the parents were not feeding the children; the parents were smoking marijuana in front of the children; the children had head lice; and K.K., the middle child, had a constant toothache.
DHR investigated the report, determined that it was indicated, and began providing services to the family. Former DHR child-protective-services worker Charlotte Shemwell testified that she interviewed Valerie Jones, the counselor at the children's elementary school, and learned that the children had reported to Jones that they were hungry every day. Shemwell also learned that C.K., the oldest child, needed eyeglasses and that the teachers at his school had contributed money to buy him a pair the previous year. At an Individualized Service Plan ("ISP") meeting in October 2003, the following goals were identified for the parents: to maintain a sober lifestyle, to provide the children with good nutrition and access to basic medical care, and to supervise the children's educational progress. Shemwell referred the parents to Family Options, a short-term, in-home, intensive parenting-skills program. Nancy Eidsan of Family Options testified that her agency was brought in as a "preservation intervention" to avoid placement of the children outside the home. Among other things, Family *Page 890 
Options assisted the mother in transporting K.K. to the dentist and in completing an application for Medicaid benefits for the children.
The parents cooperated with Family Options for a year and appeared to be making progress in dealing with the issues that had resulted in the CAN report. Nancy Eidsan testified that the challenges facing the family "struck [her] as an issue of poverty as opposed to an issue of willingness." Family Options closed its file on the family in October 2004.
In January 2005, however, DHR received another CAN report concerning the family. Valerie Jones reported that K.K. had not been to the dentist for follow-up care and was still experiencing a toothache. In addition, Jones said, C.K. had broken his glasses and was falling behind in his academic work. Charlotte Shemwell wrote the parents a letter notifying them that DHR had received a report indicating that they had neglected the children's medical needs and requesting that they schedule an appointment with Shemwell. When the parents failed to respond to the letter, DHR removed the children from the home. A shelter-care hearing was held on January 12, 2005, at which time both parents tested positive for marijuana and agreed to cooperate with DHR's reunification services. The children were found to be dependent, and DHR placed them in foster care. While the children were in foster care, the parents cooperated with DHR and made improvements in their living arrangements. In March 2005, DHR provided the parents with assistance from Youth Villages, a rehabilitation and reunification program like Family Options. DHR social-service caseworker Kara Carter-Price, who took over the case from Charlotte Shemwell in October 2005, outlined the difference between Family Options and Youth Villages by explaining that Family Options is a short-term service, whereas Youth Villages "run[s] a longer time. They can be in the home for as long as their services are needed, basically." Youth Villages worked with the family for 527 days and was still providing services at the time of hearings on the petitions to terminate parental rights.[1]
The children were returned to the parents in April 2005. At that time, Youth Villages assisted the parents with parenting-skills training; gave them shopping and budgeting advice; supervised the parents' contacts with personnel at the children's school; arranged tutoring and after-school care for the children; helped to manage the children's health-care needs; and provided the family with transportation, food, and clothing vouchers. In September 2005, DHR referred both parents for psychological evaluations. When the parents failed to appear for an ISP meeting in November 2005, DHR ascertained that the parents had moved, had left no forwarding address with service providers, and had been living in separate places — the father with his brother and the mother and children with the mother's sister in Tennessee. DHR also learned that the children had not been taken to school for a week. DHR then picked up the children and placed them back in foster care, where they remained at the time of trial.
The father had a psychological evaluation in January 2006. Other than the fact that counseling was recommended for the father, the results of that evaluation were not offered or admitted in evidence. At a January 2006 ISP meeting, additional goals were identified for the parents — for both parents to obtain safe and stable *Page 891 
housing and for the father to obtain his driver's license. The father had been convicted of a driving-under-the-influence offense in Massachusetts in 1991 and had not had a driver's license since that time. Nevertheless, the father's employer had been allowing him to use the company truck for both business and personal use. The evidence at trial indicated that the father had saved $550 to pay off the fine and court costs in the Massachusetts case and that, although he had remitted that sum to the appropriate Massachusetts agency, there was still a "hold" on him in that state — apparently as a consequence of outstanding warrants or fines — that prevented him from obtaining an Alabama driver's license.
The family's living arrangements were the subject of much of the testimony at trial. When DHR first opened the case for services, the family had been living in a small, two-bedroom mobile home for seven or eight years. The father owned the mobile home and had been paving $75 per month in lot rent. The father testified that the two daughters shared one bedroom, that the son slept in the other bedroom, and that the parents slept on a fold-out sofa in the living room. DHR informed the parents that the residence was too small and that they needed to move, so the family moved to a three-bedroom house with a rental payment of $475 per month. The father testified that he had repaired the central air-conditioning and heating system in the home with the expectation that the landlord would give him a reduction on the rent for the labor and materials he had supplied. When that did not occur, the family could not afford the rent and they were evicted. It was after the eviction that the parents left the area — the father went to live with his brother, the mother and children went to live with the mother's sister in Tennessee — and the children were eventually picked up and returned to foster care.
The family's next house, for which they also paid $475 per month, was, according to DHR, unsuitable because the position of the stove and the steepness of the stairs presented safety issues for the children. The father then acquired a "fixer upper" and was in the process of renovating it to buy when it was sold to another buyer. Finally, at the time of trial, the father was living in a mobile home on Brownsboro Road in Gurley.
There were two home studies done of the Brownsboro Road residence — one by Carolyn Nixon, a juvenile-court dependency investigator and one by Mary Jane Quirk, a Youth Villages family counselor. Nixon performed her home study on February 12, 2007. Nixon found the residence unsuitable because its yard was littered with debris and trash, it had no electrical service, and it had a broken window. The father acknowledged that the condition of the mobile home was unsuitable for children when Nixon saw it. In fact, he testified that he had not been living there but had been staying either with his brother or with a friend while he worked on the mobile home to make it suitable for the children. Quirk performed her home study on April 28, 2007, and, at that time, she concluded that the mobile home was safe and appropriate for children. On cross-examination, Quirk acknowledged that she had not tested the appliances in the home to see if they were working. Both Nixon and Quirk took photographs of the mobile home and the yard and identified and explained those photographs during their testimony. This court has viewed the photographs and notes that there was a marked improvement in the condition of the property at the time Quirk visited it over the condition of the property at the time Nixon visited it. The father conceded *Page 892 
that the residence had some deficiencies, specifically that the broken window had not been replaced and that the electrical power had not been turned on, but, he said, if the children were returned to him, those deficiencies could be remedied quickly.
Both parents tested positive for marijuana at the shelter-care hearing on January 12, 2005. Thirteen months later, at a February 2006 ISP meeting, DHR brought in a representative from the Family Drug Court program to explain to the parents the services that that program offered. The parents "decided not to take those services," so DHR referred the parents for color-code drug screening through the Madison County Office of Alternative Sentencing. DHR caseworker Kara Carter-Price described the father's cooperation with the drug-screening program as "sporadic." For the year 2006, the father tested negative for marijuana more than 30 times, but he had 17 "no-shows" for testing, which DHR considers positive results. The test records indicate that, with the exception of "no-shows" on June 22, August 3, October 11, and November 17, the father tested negative for marijuana within a week of each "no-show." For the "no-shows" on June 22, August 3, October 11, and November 17, the father tested negative for marijuana within 21 days of the "no-show." The evidence indicated that on April 5 the father's creatinine level was below the "cutoff" number and that his urine specimen was, therefore, considered "diluted." Two days later, however, on April 7, the father tested negative for marijuana.
For five of his "no-shows," the father presented signed excuses from his employer. The evidence indicated that the father had complained to DHR that, because of his employment on landscaping jobs that took him out of the county, he was often unable to report to the Office of Alternative Sentencing by 4:30 p.m., when that office closed for the day, in order to undergo his drug screens. The father requested that DHR allow him to have his drug screens performed at another facility that had extended hours. Youth Villages informed DHR that it could accommodate the father's request for extended hours testing, but DHR refused to allow Youth Villages to conduct the father's drug screens. Explaining DHR's refusal, Carter-Price testified:
 "We felt that the color code program is a substantial program and we felt that we have so many families that also work . . . late hours and they make the opportunity to go and so to have Youth Villages doing this range of services when that is not their expertise and the color code program where the Alternative Sentencing is concerned, that is their expertise. We felt it was more viable if an agency like the color code program [at] Alternative Sentencing did that testing."
When Carter-Price was asked, "Other than [the father's] missing drug screens, do you have any evidence that he is currently using drugs?" she answered, "No, I do not." Youth Villages family counselor Mary Jane Quirk testified that she had had training as a substance-abuse counselor and that she had been in contact with the father three or four times a week, including weekends, from July to November 2006. She said that, during that time, she had neither seen nor suspected that the father was abusing drugs.
Carter-Price testified that the parents had been living and working together until March 2006, when the mother, who suffered from severe depression, had a significant deterioration in her mental condition. The mother abandoned the family, cut off all contact with the children, discontinued *Page 893 
all cooperation with DHR, and began living with a paramour who had been convicted of murder. The father testified that he still loved the mother. He said that initially he had tried to convince the mother to attend marriage counseling in an attempt to reconcile with him, but eventually he determined that the marriage would not work and he filed for a divorce. Until the mother left, DHR's plan was to reunify the family; after the mother was out of the picture, DHR apparently decided to move toward termination of the father's rights.
As a follow-up to his psychological evaluation in January 2006, the father had one counseling session with Dr. Kitson Francis in May 2006. The father testified that he declined to participate in further counseling with Dr. Francis because, the father said, it was a "waste of time." The evidence was undisputed that the father and the children have a loving relationship. DHR caseworker Kara Carter-Price testified that the father was "positive and loving" with the children. Youth Villages caseworker Gwendolyn Pinkston and family counselor Mary Jane Quirk testified that the father was "very loving and caring" with the children. They thought that the father interacted with and disciplined the children appropriately. Quirk said that during visitation sessions the children clung to the father, vied with each other to sit next to him, and were reluctant to leave when they were told that the visitation session was over. The father usually visited with the children three or four times a week, including church on Sunday, and had frequent and regular — often daily — telephone contact with them.
The father raises four issues on appeal: (1) that the juvenile court erred by admitting hearsay; (2) that the juvenile court erred by considering two court reports that, he says, were neither admitted in evidence nor subject to cross-examination; (3) that DHR did not prove grounds for termination of his rights by clear and convincing evidence; and (4) that the juvenile court's finding that DHR had made reasonable efforts to reunify him with his children was not supported by clear and convincing evidence.
 Hearsay
The father contends that the juvenile court erred by admitting, over his hearsay objection, the testimony of school counselor Valerie Jones that the children had told her that they were hungry and that they "did not have food to eat in their home."
The children's statement that they were hungry was clearly admissible under Rule 803(3), Ala. R. Evid., as a statement of their then existing state of mind and physical condition. Rule 803(3) provides:
 "A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will."
In J.L. v. L.M., 805 So.2d 729, 731
(Ala.Civ.App. 2001), this court held that Rule 803(3) "allow[s] the admission of statements regarding a declarant's hunger." On the other hand, "Rule 803(3)[, Fed.R.Evid.,] has been held not to allow more expansive statements elaborating upon the underlyingreasons for the declarant's state of mind" if the underlying reasons depend upon the declarant's "memory or belief." United States v. Alzanki, 54 F.3d *Page 894 
994, 1008 (1st Cir. 1995).[2] See also United States v.Cohen, 631 F.2d 1223, 1225 (5th Cir. 1980) (stating that "[i]f the reservation in the text of [Rule 803(3), Fed.R.Evid.,] is to have any effect, it must be understood to narrowly limit those admissible statements to declarations of condition — `I'm scared' — and not belief — `I'm scared because [someone] threatened me"`).
Even if testimony regarding the reason the children were hungry — i.e., that they "did not have food to eat in their home" — was inadmissible, the admission of that testimony was harmless error because other evidence of the same import had previously been admitted without objection or motion to strike. See B M Homes v. Hogan, 376 So.2d 667,673 (Ala. 1979). DHR social worker Charlotte Shemwell had previously testified, without objection or motion to strike, that DHR had received a report in 2003 that "the parents were not feeding the children."
 The Court Reports
The father argues that the juvenile court erred by considering two documents that were not offered or admitted in evidence: a DHR court report dated November 8, 2006, and an addendum to that report dated April 17, 2007, both authored by DHR social-service caseworker Kara Carter-Price.
The record contains no indication that the juvenile court considered the court reports at the termination hearings. Nevertheless, the father argues that the court must have considered them because the court acknowledged on the record that it had read and considered another document — a letter written to the court on November 1, 2006, by Youth Villages family counselor Mary Jane Quirk — that, the father says, was placed near the court reports in the case file.
The record reveals that the juvenile judge received a letter from Quirk, that the judge sent the parties' counsel a copy of the letter, and that the judge inquired, at the trial of the termination petitions, whether the parties had received and read Quirk's letter. The following exchange occurred between the juvenile judge and counsel for DHR:
 "MR. BARCLAY [counsel for DHR]: I have a concern about the Court's consideration of any reports that are in the Court file. As I understand the current status of the law, the Court can only consider at the termination hearing those items of evidence that are in.
 "THE COURT: And let me say, the Court would only consider those items of evidence, but the Court having read that letter . . . remembers that letter. And since I remember the contents of that letter, I will share it with you.
 "MR. BARCLAY: Yes, ma'am, and I appreciate that. I just want to make certain for the record that the Court is excluding from its consideration on the termination issue, the contents of any reports in the Court file.
 "THE COURT: And let me say that one of the reasons that we went back to that letter in recalling it, is because of the report from Miss Quirk today and I had somehow thought perhaps I had had a prior report from Miss Quirk, but it turns out it was not a report, but the letter I'm referencing to you now, which, in fact, did have information. *Page 895 
 "MR. BARCLAY: Again, Your Honor, I want to make certain for the record and I'm clear that the Court did not consider any reports that are not —
 THE COURT: And let me say that this is not a report. This appears to be a letter from some time ago from [Ms. Quirk] and the letter, let me say — which, by the way, I sent copies to each of you — the letter itself was dated: Dear Judge Sherrod, dated November 1, 2006, and on information where I stamped in that letter with the Clerk's office on November 9th, sent a copy to each of you, including sending a copy to the [Court Appointed Juvenile Advocate].
 "MS. COATS [counsel for the father]: I received it.
 "THE COURT: She received it. I will make sure we get that copied because I want everybody to have a copy of it because although it is not being considered on the issue of termination, it did provide information to this Court that may be relevant in your examination today."
As the foregoing exchange indicates, counsel for DHR stated his position that, when the juvenile court was deciding whether to terminate the father's parental rights, it should not consider the court reports. The juvenile court implied that it agreed with that position because the court pointed out that the Quirk letter was not a "report." The father's counsel raised no allegation or objection — at the time of the foregoing exchange, later in the trial, or by postjudgment motion — that the juvenile court had actually considered the court reports. Thus, the issue is waived. This court cannot consider arguments raised for the first time on appeal. Our review is restricted to the evidence and the arguments considered by the trial court. Andrews v. Merritt Oil Co.,612 So.2d 409, 410 (Ala. 1992); Abbott v. Hurst, 643 So.2d 589
(Ala. 1994). See also Rule 4(a)(3), Ala. R.App. P. (any error asserted in the trial court may be asserted on appeal). Moreover, there is nothing in the record to indicate that the juvenile court considered the court reports, and, because the court reports were not offered or admitted in evidence, we must conclude that the court did not consider them. We know, however, from the court's own statements, that it did read and consider the Quirk letter. We quote the letter in its entirety:
 "Dear Judge Sherrod:
 "I am writing this letter in regards to the Termination of Parental Rights Case [regarding the father] that will be taking place on November 8. I am a family counselor at Youth Villages and have been working with [the father] since August 2006. [The father] has been receiving services through Youth Villages since May 25, 2005. During this time, [the father] has made marked progress toward being able to provide for the needs of his children. My purpose in writing this letter is to highlight the progress that [the father] has made and provide you with clear evidence of his progress.
 "[The father] has made distinct progress in the following areas when one considers where [the father] was when his case was originally opened with DHR and where [the father] is now in terms of his parenting skills and ability to provide for his children:
 "1. Working with Youth Villages — I have been [the father's] family counselor since August 2006 and in that time, [the father] has met with me consistently (fewer than 5 missed appointments), has been communicative and introspective about his role in bringing his family back together, and has completed tasks and homework assignments related to the therapeutic process. [The father] *Page 896 
has made it clear to me, his counselor, that he will work as hard as he needs to in order to be reunited with his children.
 "2. Building positive relationships with his children — [The father] maintains contact and communication with his children on a daily and weekly basis. [The father] makes nightly phone calls to his children, making a point to talk with each of them and learn what he can about their day. [The father] participates in weekly supervised visits on Saturday mornings with his children at a McDonald's restaurant. These visits consist of [the father's] having breakfast with his children and talking and playing with them. [The father] has expressed a strong interest in being able to take his children fishing on the weekends as they used to do when the children were in his care.
 "3. Substance use testing — [The father] has cooperated with participating in Drug Court through Madison County Probation for almost a year. [The father] has participated so consistently that earlier in the year he was stepped down from two tests per week to one per week. [The father] has had 36 clean drug tests during this time. [The father] has missed 15 drug tests, and states that these misses were due to work constraints that took him out of the county, too far from the probation office. Furthermore, [the father] adamantly states that he has no desire to use any substances and has expressed willingness to participate in other types of drug testing should it be deemed necessary (hair testing, substance use assessment).
 "4. Employment — [The father] currently maintains full time employment and has adequate income for supporting his children. [The father] states that he will be prepared to implement a budget should the children be placed in his care. In addition, [the father] has discussed the importance of fiscal responsibility with me and it is my opinion that he fully understands the importance of being able to provide financially for his children. [The father] maintains a positive relationship with his employer by communicating openly with his supervisors, maintaining excellent attendance records, and consistently acting and working in a responsible manner. This positive relationship that [the father] has fostered with his employer lends itself to the conclusion that [the father] will continue to maintain employment and is a desirable employee for employers to have.
 "5. Driver's license reinstatement — [The father] has spent considerable time working on his own and with counselors at Youth Villages to research how to get his driver's license back and to make plans to physically get his license. At this time, monetary and work-related constraints make it difficult for [the father] to get his license, as he would have to travel to Massachusetts to rectify the situation. [The father] is aware of pertinent case information regarding his license reinstatement including the amount of the fine he must pay, where to send the fine, whom to call to inquire about a court hearing, and where to go in order to appear for this court hearing. [The father] has every intention of paying the fine and taking the necessary steps to get his license back once he has the money saved and once he can take a few days off of work to travel to Massachusetts. [The father] works in the landscaping field and the winter months would prove to be the best time for him to take time away to travel to Massachusetts.
 "6. Housing — [The father] currently lives in a home that would be safe and *Page 897 
appropriate for children. I have visited the home and believe that it is in a safe neighborhood that the children would enjoy living in. I have spoken with the individual who owns the home and he states that he is happy to have [the father] and his children in the home. [The father] has stated that he believes the home would be child-friendly and child-ready. [The father] also states that any changes that might need to take place in the home as a result of a home study would be done immediately so that the children could live there with him.
 "7. Identification of supports — [The father] has worked diligently with me to identify individuals in his life that he can rely on for support. [The father] has identified the importance of not only identifying these support systems, but also being comfortable and capable of using them, especially when he or the children need something. [The father] has a number of close friends and family members that he could call on should he need help with child care, transportation, or mentorship for the children. In addition, [the father] has many individuals that he could call upon should he need personal support.
 "I believe that the information provided in this letter provides an accurate, comprehensive picture of the work that [the father] has done in his time working with Youth Villages. In the time that I have worked with [the father] he has made it clear that he wants nothing more than to be with his children and will do what it takes to make this happen. I believe that [the father's] progress demonstrates his commitment to his children and his family and this commitment would continue should he be given the opportunity to have full guardianship of his children. I believe that [the father] should be given the opportunity to further demonstrate this commitment to his family and have his children in his care.
 "Youth Villages would continue to be involved with the family for services until full stability was achieved.
 "I thank you for the time you have taken to read this letter and the following court report. Unfortunately, I will not be able to be present in court on the 8th of November due to a company conference taking place in Memphis, TN and I am hoping that this letter provides a clear picture of my position on the case. Representatives from Youth Villages will be present in court on the 8th and will be able to answer any questions you or anyone else might have. I am reachable by phone on the 8th or any time thereafter should more information be needed that my colleagues could not provide. I am always willing to provide more information and evidence of [the father's] growth and progress in his time in services with Youth Villages and would happily discuss the case with you more should you deem that necessary.
 "Sincerely,
 "Mary Jane E. Quirk, MS Youth Villages Family Counselor"
 Grounds for Termination
Alabama law provides that a juvenile court may terminate a parent's rights if the State proves by clear and convincing evidence that grounds for termination exist and that all viable alternatives to the termination of parental rights have been considered. See § 26-18-7, Ala. Code 1975; Exparte Beasley, 564 So.2d 950, 952 (Ala. 1990). "Clear and convincing evidence" is "`[e]vidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of *Page 898 
the claim and a high probability as to the correctness of the conclusion.'" L.M. v. D.D.F., 840 So.2d 171, 179
(Ala.Civ.App. 2002), (quoting § 6-11-20(b)(4), Ala. Code 1975). Section 26-18-7(a) sets out the grounds for termination:
 "that the parents of a child are unable or unwilling to discharge their responsibilities to and for the child, or that the conduct or condition of the parents is such as to render them unable to properly care for the child and that such conduct or condition is unlikely to change in the foreseeable future."
In determining whether those grounds exist, the juvenile court may consider the following eight statutory factors or circumstances as indicative of a parent's inability or unwillingness to discharge his or her parental responsibilities:
 "(a) If the court finds from clear and convincing evidence, competent, material, and relevant in nature, that the parents of a child are unable or unwilling to discharge their responsibilities to and for the child, or that the conduct or condition of the parents is such as to render them unable to properly care for the child and that such conduct or condition is unlikely to change in the foreseeable future, it may terminate the parental rights of the parents. In determining whether or not the parents are unable or unwilling to discharge their responsibilities to and for the child, the court shall consider, and in cases of voluntary relinquishment of parental rights may consider, but not be limited to, the following:
 "(1) That the parents have abandoned the child, provided that in such cases, proof shall not be required of reasonable efforts to prevent removal or reunite the child with the parents.
 "(2) Emotional illness, mental illness or mental deficiency of the parent, or excessive use of alcohol or controlled substances, of such duration or nature as to render the parent unable to care for needs of the child.
 "(3) That the parent has tortured, abused, cruelly beaten, or otherwise maltreated the child, or attempted to torture, abuse, cruelly beat, or otherwise maltreat the child, or the child is in clear and present danger of being thus tortured, abused, cruelly beaten, or otherwise maltreated as evidenced by such treatment of a sibling.
 "(4) Conviction of and imprisonment for a felony.
 "(5) Unexplained serious physical injury to the child under such circumstances as would indicate that such injuries resulted from the intentional conduct or willful neglect of the parent.
 "(6) That reasonable efforts by [DHR] or licensed public or private child care agencies leading toward the rehabilitation of the parents have failed.
 "(7) That the parent has been convicted by a court of competent jurisdiction of any of the following:
 "a. Murder or voluntary manslaughter of another child of that parent.
 "b. Aiding, abetting, attempting, conspiring, or soliciting to commit murder or voluntary manslaughter of another child of that parent.
 "c. A felony assault or abuse which results in serious bodily injury to the surviving child or another child of that parent. The term `serious bodily injury' means bodily injury which involves substantial risk of death, extreme physical pain, protracted and obvious disfigurement, or protracted loss or impairment *Page 899 
of the function of a bodily member, organ, or mental faculty.
 "(8) That parental rights to a sibling of the child have been involuntarily terminated."
§ 26-18-7(a). In addition, when a child is no longer in the physical custody of a parent the juvenile court must consider four additional factors or circumstances:
 "(b) Where a child is not in the physical custody of its parent or parents appointed by the court, the court, in addition to the foregoing, shall also consider, but is not limited to the following:
 "(1) Failure by the parents to provide for the material needs of the child or to pay a reasonable portion of its support, where the parent is able to do so.
 "(2) Failure by the parents to maintain regular visits with the child in accordance with a plan devised by the department, or any public or licensed private child care agency, and agreed to by the parent.
 "(3) Failure by the parents to maintain consistent contact or communication with the child.
 "(4) Lack of effort by the parent to adjust his or her circumstances to meet the needs of the child in accordance with agreements reached, including agreements reached with local departments of human resources or licensed child-placing agencies, in an administrative review or a judicial review."
§ 26-18-7(b). In determining whether there are grounds for termination, the juvenile court is not limited to considering just the statutory factors. See § 26-18-7(a).
It appears that several of the juvenile court's findings relate to nonstatutory factors. In its judgment terminating the father's rights, the juvenile court made findings that it divided into eight subject-matter paragraphs. We will examine each paragraph and the findings therein, whether based on statutory or nonstatutory factors, to determine if those findings are supported by clear and convincing evidence. The juvenile court's first factual finding with respect to the grounds for termination was:
 "[1] Reunification services afforded the father of the child[ren] included a psychological evaluation and mental health counseling. The father failed and refused to comply with recommendations with regard to counseling."
The finding that the father failed to comply with the recommendation that he undergo counseling is supported by clear and convincing evidence. In fact, the father said he thought the one counseling session he had attended was a "waste of time." However, because DHR did not offer the results of the father's psychological evaluation in evidence, it is difficult to assess whether the father's noncompliance constitutes a ground for termination of his rights. In other words, without evidence as to the reason for the recommendation that the father have counseling, we are unable to determine whether the grounds for termination listed either in § 26-18-7(a)(2) ("[e]motional illness, mental illness or mental deficiency of the parent . . . of such duration or nature as to render the parent unable to care for needs of the child") or § 26-18-7(b)(4) ("[l]ack of effort by the parent to adjust his or her circumstances to meet the needs of the child in accordance with agreements reached with local departments of human resources. . . .") applied.
The juvenile court's second factual finding is not supported by clear and convincing evidence: *Page 900 
 "[2] Ms. Carolyn Nixon, Juvenile Court Dependency Investigator, attempted on numerous occasions to conduct a home study on the father's purported residence, without success. The father has failed to make himself available for the purpose of conducting that home study.
"Nixon attempted without success to conduct a home study on the residence at the address given to her by the father on one occasion — December 26, 2006. On that occasion, Nixon found the property occupied by a third party who stated that he did not know the father and Nixon left the premises. However, Nixon was able to complete her home study on a subsequent occasion, February 12, 2007.
The juvenile court's third paragraph containing its findings states:
 "[3] The father has had as many as ten (10) addresses during the time the children have been under the supervision of the Court. The father testified that his present residence address is [on] Brownsboro Road, Gurley, Alabama. That purported residence is a mobile home which is not adequate to meet the needs of the children. There is no present electrical service to that home. There are one or more broken windows which have not been repaired over the course of several months. There are other deficits with respect to that property which have persuaded the Court that it is not an appropriate, safe, environment for the child[ren] at this time."
The juvenile court's statement that "[t]he father has had as many as ten (10) addresses during the time the children have been under the supervision of the Court" is accurate if the address count includes the two times that the father temporarily lived with his brother when he was "between residences" and the three times that the father lived in a friend's rental trailer in Sunnydale while he was cleaning up or renovating another residence for his family's future use. Otherwise, the address count is closer to 5 than to 10.
In our judgment, the fundamental issue is not the number of addresses the father had while his children were in foster care but whether his multiple addresses constituted grounds for determining that he was unable or unwilling to discharge his parental responsibilities to his children. We conclude that, under the particular circumstances of this case, they do not.
The evidence indicated that, before DHR became involved in the case in 2003, the family had been living for seven or eight years in a small but adequate mobile home that the father owned and for which he was paying only $75 per month in lot rent. DHR, however, opined that the mobile home was too small and induced the father to move. From that point on, the father was engaged in a struggle to find living quarters that would satisfy DHR and still be within his means. Given the father's efforts to find suitable housing in the face of financial difficulty, we cannot hold that his having multiple addresses was a factor indicating his unwillingness to discharge his parental responsibilities to his children. On the contrary, his multiple attempts to obtain a suitable residence tended to show his willingness to do whatever it took to fulfill the requirement that DHR had set for him with respect to housing, even if meeting that requirement was more costly than his former housing had been. The housing issues the father faced appeared to be more a function of his poverty than any other factor. "`[P]overty alone is not enough to warrant the termination of parental rights.' C.B. v. State Dep't ofHuman Res., 782 So.2d 781 (Ala.Civ.App. 1998)." A.J.H.T.v. K.O.H., 983 So.2d 394, 406 (Ala.Civ.App. 2007). Seealso In re Hickman, 489 So.2d 601, 602-03 *Page 901 
(Ala.Civ.App. 1986) (stating that "[p]overty and limited mentality of a mother, in the absence of abuse or lack of caring, should not be the criteria for taking away a wanted child from the parents" (quoted in Bowman v. State Dep't ofHuman Res., 534 So.2d 304, 306 (Ala.Civ.App. 1988), andD.A. v. Calhoun County Dep't of Human Res.,892 So.2d 963, 968 (Ala.Civ.App. 2004))); and KM. v. Shelby CountyDep't of Human Res., 628 So.2d 812, 813
(Ala.Civ.App. 1993).
The juvenile court's fourth paragraph containing its findings states:
 "[4] [T]he father has failed and refused to provide reasonable material support for the child[ren] during the time the[y] [have] been in foster care. He failed and refused to provide necessary dental care [for K.K.] and eyeglasses for [C.K.]. Nonetheless, he continued to spend money to take care of several dogs and to purchase cigarettes for his own use. The Court is satisfied from the evidence that, if the child[ren] were returned to his care, he would again neglect their medical and financial needs."
The evidence was undisputed that the father did not pay any child support while his children were in foster care. The finding that he "failed and refused to provide necessary dental care" for K.K. is not supported by clear and convincing evidence. When asked why he did not seek medical attention for K.K.'s toothache, the father acknowledged that school officials had informed him on several occasions that K.K. was complaining of a toothache, but, he said, when he picked up K.K. from school on those occasions, she did not mention having a toothache and she acted "fine." Moreover, the father testified that K.K. went for an entire summer vacation without complaining of a toothache but that, when school resumed in the fall, school officials informed him that K.K.'s toothache complaints had resumed. The father testified that he thought there might be some degree of manipulation in K.K.'s complaints — a way to "get out of class," he suggested. Nevertheless, when Family Options intervened and assisted the mother in getting K.K. to the dentist and it appeared that K.K. needed dental work but had no health insurance, the father brought $60 to the dentist to pay for the child's treatment. Thus, it appears that, once the father was confronted with the reality of the child's dental problems and could no longer doubt the veracity of the child's complaints at school, he provided the funds for her treatment.
The evidence also does not support the finding that the father "failed and refused" to provide eyeglasses for C.K. Theonly evidence DHR presented with respect to this issue was that the child needed glasses, that the teachers at his school had contributed money to buy him a pair of glasses, and that the child had subsequently broken or lost the glasses. From that evidence alone, there is no permissible inference that the father even knew that the child needed glasses, much less that the father had failed or refused to provide the child with glasses.
Although there was evidence indicating that the father had spent money on the upkeep of several dogs and on cigarettes for himself, we cannot hold that the evidence was clear and convincing that "if the child[ren] were returned to [the father's] care, he would again neglect their medical and financial needs." Nancy Eidsan of Family Options, who worked with both parents on the children's health needs, testified that the challenges facing the family "struck [her] as an issue of poverty as opposed to an issue of willingness." The social workers and counselors who dealt with the father acknowledged *Page 902 
that he loved the children; that he interacted with and disciplined them appropriately; and that he was positive, caring, and loving with them.
The juvenile court's fifth finding states:
 "[5] As a part of reunification services offered to the family, the father was requested to undergo random drug screens through a color-coding system operated by the Madison County Office of Alternative Sentencing. Compliance with requirements of that program would have required the father to call a telephone number each morning, to ascertain whether his assigned color was called on that day and, if so, to report for a drug screen. The father offered various excuses for his failure to comply with drug screening, including some apparently legitimate conflicts with his work schedule. Nonetheless, the father's work schedule does not explain all of his missed drug screens; nor does it explain his acknowledged failure to even call or attempt to ascertain whether a screen was required on many occasions."
This finding, although supported by some evidence, is insufficient to authorize the termination of the father's parental rights. The father had over 30 negative drug screens. DHR presented evidence of one "diluted" screen. Although the father had 17 "no-shows" in 2006, he not only presented a plausible, employment-related reason for the "no-shows," but he requested an alternative testing site that would, he said, eliminate the "no-show" issue. DHR rejected that request. Even DHR's own witnesses stated that they had no evidence, apart from the father's "no-shows," that he was currently using drugs. The ground for termination stated in § 26-18-7(a)(2) is that a parent exhibits "excessive use of alcohol or controlled substances, of such duration or nature as torender the parent unable to care for needs of the child." (Emphasis added.) DHR presented no evidence tending to satisfy subsection (a)(2).
The juvenile court's next factual finding states:
 "[6] The father acknowledged that his driver's license was suspended in the state of Massachusetts approximately seventeen (17) years ago following his conviction for driving under the influence of alcohol. At each of the various evidentiary hearings scheduled in this matter, the father has asserted that he is `working on' getting his license reinstated. Those efforts have been inadequate, however, and he still lacks a valid driver's license. Notwithstanding that fact, he operates a company truck in connection with his employment and also uses that truck for personal transportation, as well, in violation of Alabama law."
The father presented documentary evidence to substantiate his testimony that he had paid $550 to the appropriate Massachusetts agency in satisfaction of the amounts due for his 1991 driving-under-the-influence conviction. He also submitted documentation of the fact that Massachusetts would not issue a "clearance letter" allowing him to obtain an Alabama driver's license. The father presented evidence indicating that, to resolve the matter, he would have to travel to Massachusetts or retain an attorney in Massachusetts, either of which would be costly to him. DHR's and the juvenile court's reliance on this ground as a basis on which to terminate the father's rights appears to penalize the father for his poverty rather than for any willful dereliction of parental duty.
 The juvenile court's seventh finding is as follows: *Page 903 
 "[7] The Court concludes, from the evidence, that while the father loves the child[ren] and would like to be reunited with them, he remains unable or unwilling to conform his conduct to reasonable requirements imposed by the Madison County Department of Human Resources, the family's Individualized Service Plan team, and this Court."
This finding is essentially a summary, in conclusory form, of all the statutory and nonstatutory factors authorizing termination of parental rights. It adds nothing specific to the juvenile court's determinations. The juvenile court's last factual finding states:
 "[8] The father justified his failure to comply with many reunification services as being the result of his busy work schedule. The Court has concluded from the evidence that, if the father has insufficient time to comply with minimal reunification services, he would have inadequate time to effectively parent the child[ren]. The father's purported long work hours, and the complete lack of any evidence of his plans to provide for his children while he is working, further support the Court's determination that he is unable to safely, effectively parent the child[ren]."
By all accounts, the father is a hard worker and a trustworthy employee. According to all the witnesses who observed him with his children, he is also a loving father. While the mother was present in the home as a stay-at-home caregiver for the children, DHR's plan for the family was reunification. Yet, after the mother abandoned the family, DHR's plan appeared to change to termination of the father's rights. We can find in the record no affirmative conduct or dereliction of duty on the father's part that caused DHR to alter its case plan for this family after the mother left, and we can only conclude that the father's "long work hours" were a plus while the mother was in the picture but that, now that she is out of the picture, they are a minus. To fault the father for having "inadequate time to effectively parent the children" is to ignore the fact that the father's lack of education means that he must work long hours to provide for his family. If he were not working — or not working as hard — DHR might fault him for lack of employment stability. In short, the validity of this finding also turns on the fact that, as this court observed in Inre Hickman, 489 So.2d at 602-03, "[p]overty . . . in the absence of abuse or lack of caring, should not be the criteria for taking away a wanted child from the parents."
Because many, if not most, of the juvenile court's findings are in conflict with the testimony of Nancy Eidsan of Family Options and Gwendolyn Pinkston of Youth Villages — both of whom were objective third-party service providers put in place by DHR — and with the views expressed in the letter to the juvenile court from Mary Jane Quirk, a family counselor for Youth Villages, we cannot uphold that court's judgment under a clear-and-convincing evidentiary standard.
The judgment of the Madison Juvenile Court is therefore reversed, and the cause is remanded for proceedings consistent with the principles expressed in this opinion.
REVERSED AND REMANDED.
THOMPSON, P.J., and PITTMAN and MOORE, JJ., concur.
BRYAN, J., concurs in the result, without writing.
[1] The juvenile court held hearings on the petitions on four separate dates — January 3, 2007; March 5, 2007; May 1, 2007; and May 17, 2007.
[2] Rule 803(3), Ala. R. Evid., is identical to Rule 803(3), Fed.R.Evid. "[C]ases interpreting the Federal Rules of Evidence will constitute authority for construction of the Alabama Rules of Evidence." Advisory Committee's Notes, Rule 102, Ala. R. Evid. See also Shoney's Inc. v. Barnett,773 So.2d 1015, 1029 (Ala.Civ.App. 1999). *Page 904