THOMAS, Judge.
S.L.J.F. (“the mother”) appeals the judgment of the Cherokee Juvenile Court terminating her parental rights to J.R.B. (“the son”) in case no. JU-11-131.03. The mother was never married to C.B. (“the father”), who is the' father of the son and whose parental rights were also terminated. The mother also appeals the juvenile court’s judgments terminating her parental rights to E.R.F., Jr. (“the half brother”) in ease no. JU-11-136.03 and to J.L.F. (“the half sister”) in case no. JU-13-38.02 (the half brother and the half sister are hereinafter referred to collectively as “the half siblings”). The juvenile court also terminated the parental rights of E.R.F., Sr. (“the husband”), who is the father of the half siblings and the mother’s husband. The husband has not appealed the termination of his parental rights.
As a threshold matter, we first address our jurisdiction to consider the mother’s appeal. On June 10, 2014, the Cherokee Department of Human Resources (“DHR”) filed a motion to dismiss the mother’s appeal as untimely filed, which this court originally denied. However, “[w]e note that a denial of a motion to dismiss an appeal does not preclude reconsideration of the fundamental question of appellate jurisdiction after an appellate court has had an opportunity to review the record.” Smith v. Smith, 919 So.2d 315, 316 n. 1 (Ala.Civ.App.2005). Upon review of the record, we have discovered the following additional facts that we were not aware of when we denied DHR’s motion to dismiss the appeal.
The judgments in the underlying actions were entered on March 6, 2014. Without filing a postjudgment motion, the father filed a notice of appeal regarding the termination judgment relating to the son on March 14, 2014 (case no. JU-11-131.03). On March 21, 2014, 15 days after the juvenile court had entered its judgments, the mother filed a “Motion and Affidavit in Support of Motion for Leave to Appeal In Forma Pauperis” regarding the termination judgments relating to the son and the half siblings. In a juvenile action, “the notice of appeal shall be filed within 14 days (2 weeks) of the date of entry of the order or judgment appealed from.” Rule 4(a)(1), Ala. R.App. P.
On June 24, 2014, this court initially determined that the mother’s appeal was timely pursuant to Rule 4(a)(2), Ala. R.App. P. (“If a timely notice of appeal is filed by a party, any other party may file a notice of appeal within 14 days (2 weeks) of the date on which the first notice of appeal was filed.... ”). Therefore, because the father had filed a timely notice of appeal regarding the termination judgment relating to the son, the mother had an additional 14 days from the date of the father’s filing to perfect an appeal under Rule 4(a)(2); however, the mother’s appeal *609 could be deemed timely only regarding the termination judgment relating to the son. Thus, having reviewed the entire record, we now determine that we have jurisdiction to consider the mother’s arguments on appeal only insofar as they pertain to the termination judgment relating to the son. The mother’s appeal insofar as it pertains to the termination judgments relating to the half siblings in case no. JU-11-136.03 and case no. JU-13-38.02 is dismissed as untimely.
In December 2010, before the half sister was born, DHR became involved with the family after receiving reports of, among other things, alcohol abuse and domestic violence in the home. There is no indication in the record that the mother abused alcohol; instead, that allegation was against the husband, with whom the mother had often left the son and the half brother. At that time, DHR implemented the first of “at least” four safety plans. DHR placed the son with KM. (“the aunt”), the father’s sister, and it placed the half brother with B.J.S. (“the maternal stepgrandfather”) and C.S. (“the maternal grandmother”) (hereinafter referred to collectively as “the maternal grandparents”). The maternal grandparents lived in Georgia.[1] Thereafter, the half sister was born and the mother participated in a number of services intended to reunify the family. At times the mother made progress, and the son and the half siblings were temporarily reunited with the mother; however, as already mentioned, DHR implemented at least three other safety plans. In March 2013 the juvenile court awarded custody of the son and the half siblings to DHR, and DHR placed them together in a foster home. On September 23, 2013, DHR filed petitions seeking to terminate the parental rights of the father regarding the son and of the mother regarding the son and the half siblings.
The termination-of-parental-rights trial was held on November 20, 2013. On December 10, 2013, the juvenile court entered an order reserving its judgment. The juvenile court required DHR to evaluate the maternal grandparents and to report the results of a home study of the maternal grandparents’ home pursuant to the Interstate Compact on the Placement of Children (“ICPC”), codified at § 44-2-20 et seq., Ala.Code 1975. On March 6, 2014, DHR notified the juvenile court that placement of the children with the maternal grandparents was not approved. That same day, the juvenile court entered separate judgments terminating the father’s parental rights to the son and terminating the mother’s parental rights to the son and to the half siblings.[2] The father and the mother filed separate notices of appeal. The father’s and the mother’s appeals were consolidated ex mero motu by this court on April 4, 2014, and on July 23, 2014, we unconsolidated the appeals.
“This court’s standard of appellate review of judgments terminating parental rights is well settled. A juvenile court’s factual findings, based on ore tenus evidence, in a judgment terminating parental rights are presumed to be correct and will not be disturbed unless they are plainly and palpably wrong. See, e.g., F.I. v. State Dep’t of Human Res., 975 *610 So.2d 969, 972 (Ala.Civ.App.2007). Under express direction from our supreme court, in termination-of-parental-rights cases this court is ‘required to apply a presumption of correctness to the trial court’s finding[s]’ when the trial court bases its decision on conflicting ore ten-us evidence. Ex parte State Dep’t of Human Res., 834 So.2d 117, 122 (Ala.2002) (emphasis added). Additionally, we will reverse a juvenile court’s judgment terminating parental rights only if the record shows that the judgment is not supported by clear and convincing evidence. F.I., 975 So.2d at 972.”[3]
J.C. v. State Dep’t of Human Res., 986 So.2d 1172, 1183 (Ala.Civ.App.2007) (footnote omitted).
“A juvenile court is required to apply a two-pronged test in determining whether to terminate parental rights: (1) clear and convincing evidence must support a finding that the child is dependent; and (2) the court must properly consider and reject all viable alternatives to a termination of parental rights. Ex parte Beasley, 564 So.2d 950, 954 (Ala.1990).”
B.M. v. State, 895 So.2d 319, 331 (Ala.Civ.App.2004).
We review whether the juvenile court erred by determining that clear and convincing evidence supports the judgment terminating the mother’s parental rights to the son or by failing to consider all viable alternatives to the termination of her parental rights to the son.
Section 12-15-319(a), Ala.Code 1975, provides, in pertinent part:
“(a) If the juvenile court finds from clear and convincing evidence, competent, material, and relevant in nature, that the parents of a child are unable or unwilling to discharge their responsibilities to and for the child, or that the conduct or condition of the parents renders them unable to properly care for the child and that the conduct or condition is unlikely to change in the foreseeable future, it may terminate the parental rights of the parents. In determining whether or not the parents are unable or unwilling to discharge their responsibilities to and for the child and to terminate the parental rights, the juvenile court shall consider the following factors including, but not limited to, the following:
[[Image here]]
“(2) Emotional illness, mental illness, or mental deficiency of the parent, or excessive use of alcohol or controlled substances, of a duration or nature as to render the parent unable to care for needs of the child.
[[Image here]]
“(7) That reasonable efforts by the Department of Human Resources or licensed public or private child care *611 agencies leading toward the rehabilitation of the parents have failed.
[[Image here]]
“(9) Failure by the parents to provide for the material needs of the child or to pay a reasonable portion of support of the child, where the parent is able to do so.
“(10) Failure by the parents to maintain regular visits with the child in accordance with a plan devised by the Department of Human Resources, or any public or licensed private child care agency, and agreed to by the parent.
“(11) Failure by the parents to maintain consistent contact or communication with the child.
“(12) Lack of effort by the parent to adjust his or her circumstances to meet the needs of the child in accordance with agreements reached, including agreements reached with local departments of human resources or licensed child-placing agencies, in an administrative review or a judicial review.”
The mother admitted that she suffered from an emotional illness — depression— and that she took the prescription medication Prozac. She testified that she had been taken to a hospital by an ambulance after she had reported to a coworker that she had taken too many Prozac pills. Although the mother admitted that she sometimes mistakenly took the wrong dosage of Prozac, she denied that she had ever intentionally overdosed or attempted suicide. Kim Jordan, an adult therapist employed by CED Mental Health Center who treated the mother, testified that the mother had expressed feelings of worthlessness and guilt and that the mother had been diagnosed with “major depression, recurrent, severe without psychosis,” and “anhedonia,”[4] for which she was prescribed Prozac. Jordan said that the mother had said that she wanted to “get better” but that the mother had routinely failed to keep her counseling appointments or her appointments with the physician who had prescribed Prozac. See § 12-15-319(a)(2).
DHR’s witnesses indicated that the mother showed little or no lasting progress in the reunification services offered by DHR. See § 12-15-309(a)(7). In-Dea Gibson, a DHR employee, testified that DHR had provided a variety of services to the mother, including FOCUS counseling, a psychological evaluation, “Garrett Counseling,” weekly visitation with the children, and a mental-health evaluation at CED. Gibson said: “[W]e worked with [the mother and the husband] for three years, and they’re still — nothing has really changed from the first day we started working with them until now.” Rhonda Willis, a FOCUS employee who had counseled the mother for four months in 2011, said that she had worked with the mother on “communication, healthy relationships, self-esteem, and budgeting.” Although Willis testified that the mother was able to maintain employment, Willis said that the mother had not made any progress and that “the [same] issues were still there on the last day.” Willis testified that there was no other service that FOCUS could provide to the mother. Jordan testified that the mother’s diagnosis of depression had not changed.
As evidence indicating her progress, the mother testified that she had a job and an automobile. The mother agreed that she had been unable to make progress toward reunification in three years, but, she said, *612 she had left the abusive relationship with the husband and she needed more time to show that she could make progress as an individual. The mother, who was not yet divorced, admitted that, after she had left the husband, she had been in a romantic relationship with J.H. and that J.H. had pleaded guilty to domestic violence against his mother. The mother said that she was no longer in a romantic relationship with J.H. because her goal was to regain custody of the son but that she had lived with J.H. and his parents for approximately six months before the termination trial in order to save money to get a house; the mother said that she had spent her savings to purchase an automobile. The mother said that she expected to acquire a home “in the next two weeks.”
The mother admitted that she had failed to support the son. See § 12-15-319(a)(9). She said that she earned $11.50 per hour and that she worked between 40 and 60 hours per week. When asked to provide monetary support for school supplies for the son, the mother told the aunt that she could not help. Although the mother correctly argues that poverty alone is not a sufficient ground to terminate parental rights, see S.K. v. Madison Cnty. Dep’t of Human Res., 990 So.2d 887, 900 (Ala.Civ.App.2008), a review of the juvenile court’s judgment terminating the mother’s parental rights to the son indicates that the juvenile court did not base its judgment solely on the mother’s failure to provide support for the son.
The mother admitted that she had attended only half the visitations that DHR had arranged. Gibson said that DHR had arranged weekly visitation and that the mother had initially visited weekly; however, Gibson said, eventually the mother visited half as often as she was allowed and, during one period, had missed eight weeks of visits with the son. The mother said that her work schedule and automobile problems had hindered her ability to visit. See § 12 — 15—319(a)(10) and (11). Furthermore, according to Gibson, the mother had not made significant changes in her lifestyle to be able to care for the son; testimony indicated that the mother was still married at the time of the termination trial and that she was living with her boyfriend who had been convicted of domestic violence. See § 12-15-319(a)(12).
Thus, we conclude that the juvenile court did not err in finding sufficient grounds warranting termination of the mother’s parental rights. Clear and convincing evidence sufficient to terminate the mother’s parental rights to the son existed based upon § 12-15-319(a)(2), (7), (9), (10), (11), and (12), Ala.Code 1975.
Finally, the mother argues that the juvenile court failed to consider all viable alternatives to the termination of her parental rights. Gibson testified that when the juvenile court awarded DHR custody of the son and the half siblings, DHR removed the half siblings from the home of D.B. and Ca.B., who were relatives of the father, and the half siblings were placed in foster care.[5] At that time DHR also removed the son from the home of the aunt, with whom he had been placed for a period of six months, and placed him with the half siblings in foster care. Gibson said that *613 DHR’s goal was to allow the son and the half siblings to “maintain a relationship” because the children were bonded.[6] Furthermore Gibson said that the son needed a permanent placement because he had been in “probably close to 10” different homes in 3 years. Gibson also said:
“I see the three of them together now and how happy they are, and when they sit there and say, this is my brother, this is my sister, and how protective [the son] is over his younger brother and sister. I don’t think it’s fair to separate the three of them.”
Gibson testified that, of the relatives suggested by the father and the mother, the only relative willing to be considered as a placement option was the aunt, and, regarding the aunt, Gibson offered the following testimony. She said that placement of the son with the aunt had not presented any safety concerns and that the juvenile court could consider the aunt as a relative placement. On the other hand, Gibson testified that the aunt had violated the terms of an Individualized Service Plan and had allowed one or more visits with the father without DHR’s approval at a time when DHR had suspended the father’s visitation due to his domestic-violence charge. Although not stated in its findings, the juvenile court could have determined that the aunt’s failure cooperate, coupled with DHR’s goal of not separating the son and the half siblings, had warranted its determination that continued placement with the aunt would not serve to promote the son’s best interest.
“ ‘Another factor to be given weight in child custody cases is whether siblings should remain together. Although the general rule is that siblings should not be separated in the absence of compelling reasons, this policy is but one factor to be considered in light of the facts and circumstances of each particular case, keeping ever mindful that the paramount question to be decided is what will promote the best interests of the child. M.D. v. B.D., 336 Pa.Super. 298, 485 A.2d 813 (1984); see also, Commonwealth v. Reitz, 193 Pa.Super. 125, 163 A.2d 908 (1960); Wallace v. Wallace, 420 So.2d 1326 (La.Ct.App.1982).’
“[Jensen v. Short,] 494 So.2d [90,] 92 [ (Ala.Civ.App.1986) ].”
Alverson v. Alverson, 28 So.3d 784, 791 (Ala.Civ.App.2009) (Moore, J., concurring in part and concurring in the result in part)(canvassing prior Alabama cases concerning separation of siblings).
Some testimony indicated that the maternal grandparents, who lived in Georgia, had indicated that, they wanted to be considered a relative placement for the son and the half siblings. Specifically, the maternal stepgrandfather testified that the maternal grandparents were willing to care for the son and the half siblings. However, according to Gibson, she had telephoned the maternal grandmother the day before the termination trial and the maternal grandmother had said that they did not want to initiate the ICPC process, that they could not afford to take the son and the half siblings, and that they were willing to be considered as a placement for *614 the son but were unwilling to be considered as a placement for the half siblings.
Regardless, as already mentioned, the juvenile court postponed its judgment until an ICPC home study was performed, and the maternal grandparents were not approved as a placement option for the son. The ICPC provides:
“[T]he child shall not be sent, brought or caused to be sent or brought into the receiving state until the appropriate public authorities in the receiving state shall notify the sending agency, in writing, to the effect that the proposed placement does not appear to be contrary to the interests of the child.”
§ 44-2-20, Article III, subpart (d), Ala. Code 1975. In this case, Georgia, the potential receiving state, did not approve the proposed placement. Thus, DHR was prevented from transferring the son to the maternal grandparents. See D.S.S. v. Clay Cnty. Dep’t of Human Res., 755 So.2d 584, 590 (Ala.Civ.App.1999). The lack of ICPC approval provides clear and convincing evidence to support the conclusion that placement with the maternal grandparents had been properly considered and rejected as a potential viable alternative to termination of the mother’s parental rights.
For the foregoing reasons, we dismiss the mother’s appeals from the judgments of the juvenile court terminating her parental rights to the half siblings in case no. JU-11-136.03 and in case no. JU-13-38.02. We affirm the judgment of the juvenile court terminating the mother’s parental rights to the son in case no. JU-11-131.03.
JUDGMENT IN CASE NO. JU-11-131.03 AFFIRMED; APPEAL DISMISSED AS TO CASE NO. JU-11-136.03 AND CASE NO. JU-13-38.02.
THOMPSON, P.J., and PITTMAN and DONALDSON, JJ., concur.
MOORE, J., concurs in the result, without writing.

. According to the maternal stepgrandfather, the maternal grandparents had legal custody of the mother's fourth child, who is not a subject of this appeal, by agreement of the mother and the “daddy.”

. On March 7, 2014, the juvenile court corrected a clerical mistake by amending the termination judgments to correct the husband's surname. An order correcting a clerical error under Rule 60(a), Ala. R. Civ. P., is not a new judgment. It "does not toll the time for taking an appeal.” D.D. v. Calhoun Cnty. Dep’t Human Res., 81 So.3d 377, 379 n. 4 (Ala.Civ.App.2011).

. Section 12-15-319(a), Ala.Code 1975, which lists the grounds upon which parental rights may be terminated, requires that a termination judgment be supported by “clear and convincing evidence.” Section 6 — 11— 20(b)(4), Ala.Code 1975, defines “clear and convincing evidence” as
“[e]vidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion. Proof by clear and convincing evidence requires a level of proof greater than a preponderance of the evidence or the substantial weight of the evidence, but less than beyond a reasonable doubt."
See, e.g., M.H. v. Cleburne Cnty. Dep’t of Human Res., 158 So.3d 471, 477 (Ala.Civ.App.2014) (applying the definition of "clear and convincing evidence” in § 6-1 l-20(b)(4) in reviewing termination-of-parental-rights judgments)

. Merriam-Webster’s Collegiate Dictionary 48 (11th ed.2003) defines "anhedonia” as "a psychological condition characterized by inability to experience pleasure in normally pleasurable acts.”

. The half siblings were not living with the maternal grandparents at the time they were placed in foster care. Instead, the half siblings had been' placed with D.B. and Ca.B., the father’s relatives to whom they are not related. D.B. and Ca.B. were provisionally licenced foster parents. The half siblings' placement with D.B. and Ca.B. "fell through” for a reason undisclosed by the record. Although not entirely clear, it appears that DHR had planned to seek the termination of the parental rights of all the parents in order to allow D.B. and Ca.B. to adopt the son and the half siblings in an effort to keep the son and the half siblings together.

. "The mere fact that [half siblings] may not share the same biological parentage does not necessarily mean that half siblings do not develop the same bonds as full siblings or that half siblings do not rely on each other for support.” A.B. v. J.B., 40 So.3d 723, 729-30 (Ala.Civ.App.2009) (citing Marriage of Swenka, 576 N.W.2d 615, 618 (Iowa Ct.App.1998), as "recognizing the strong public policy of keeping siblings, including half siblings, together following a divorce to provide children the important benefit of maintaining familial ties and lessening the trauma of divorce”).