This case involves the termination of parental rights. On August 25, 1992, A.M.M. (child), born May 20, 1991, was found to be dependent, and all parental rights of her natural mother, K.M., and her putative father, M.J., "or any other person claiming an interest in or to the custody of said child," were terminated. Only the mother appeals.
The record reveals that on May 31, 1991, the Shelby County Department of Human Resources (DHR) filed a petition in juvenile court, requesting temporary custody of the child and alleging that K.M. was unable to discharge her responsibilities to and for the child. The petition was granted on July 26, 1991. Several reports were filed subsequently with the court and several hearings were held. On March 16, 1992, DHR filed a petition for termination of parental rights. After a hearing on the matter, parental rights were terminated by order of August 25, 1992.
The mother raises two issues on appeal: (1) whether there was clear and convincing evidence that the child was dependent; and (2) whether the trial court properly considered all viable alternatives and properly found that no alternative less drastic than termination of K.M.'s parental rights existed.
This court previously has stated the following:
 "When the State seeks to terminate parental rights, the trial court must make several findings. First, the trial court must determine from clear and convincing evidence that the child is dependent. Second, the trial court must find that no viable alternatives exist other than termination of parental rights."
M.J.G.L. v. State Department of Human Resources,587 So.2d 1004, 1005 (Ala.Civ.App. 1991) (citations omitted).
As the trial court recognized in the instant case, "this matter is not your 'normal' Termination of Parental Rights case." The parental rights of K.M.'s parents were terminated when she was 11 years old. At that time, she already had been in foster care for six years. No adoptive home was ever found for her and she began to exhibit "behavioral *Page 813 
problems" at age 13. She then began a series of placements at residential facilities and foster homes. K.M. was only 14 years old when she became pregnant. She was 15 years old, and in the permanent custody of the State Department of Human Resources, when she gave birth to the child. K.M. and her child were placed together in a licensed foster home.
The record reveals that, after living in the foster home about two months, K.M. left with her child in the middle of the night. She had her child returned by a third party to the home after only a few hours, acknowledging that she was not ready to care for a baby. K.M., however, did not return to the foster home and she was placed on run-away status. She subsequently was located and, rather than being placed with her child, she was placed in a residential facility, from which she soon ran. Thus began a pattern of K.M. running away, being located and placed in another facility, only to run away again. She had approximately eleven residential facility placements since first leaving the foster home in which her child continued to reside.
The record further revealed that, since early May 1992, K.M. has resided with her maternal grandmother, who lives about one mile away from the foster home in which the child resides. DHR placed K.M. with her grandmother, "[b]ecause when placed in her facility she'd run and rather than risk that, we placed her with her grandmother." Trial testimony reflects that DHR believes this placement to be one from which K.M. will not leave. K.M. testified at the termination hearing that, during the time she has lived with her grandmother, she has visited her child on a daily basis, walking to the home when she was unable to be driven there. K.M. further testified that the foster mother was teaching her to care for the child and she had allowed K.M. to visit overnight to be with the child. On Sundays, K.M. bathed, dressed, and fed her child and went to church with her. When she was there overnight, and her child awakened during the night, K.M. got up and rocked her and gave her a bottle. She testified that she enjoyed doing that.
K.M. has expressed an interest in finishing school, yet DHR has taken no steps to see that this is accomplished. K.M. has only an 8th-grade education. She testified, however, that while she was in school, her grades were good. When asked at trial if DHR had taken any steps to get K.M. back into school in the fall, DHR's caseworker replied, "[T]hat has not been discussed, I don't think. . . . We have not worked on that."
According to her testimony, K.M. wants to work, but she concedes she has no job skills. DHR has provided no assistance toward this end as the following testimony reveals:
"Q. Does she have any job skills at this time?
"A. None to my knowledge.
 "Q. Did she discuss with you the interest in being trained in clerical area?
"A. It was a long time back. Yes, sir.
 "Q. When you say a long time back, are you talking about how far back?
"A. '91. Summer of '91.
 "Q. Since the summer of '91, has she had any other similar discussions with you about job skills?
"A. Not skills. No, sir."
DHR points to the fact that K.M. has no money and is not able to financially provide for her child. However, as this court previously has stated, a person should not be punished for being poor.
 "Poverty . . ., in the absence of abuse or lack of caring, should not be the criteria for taking away a wanted child from the parents. Such should particularly be the case when there has been no apparent aid given toward keeping the family together by the agency seeking its termination."
In re Hickman, 489 So.2d 601, 602 (Ala.Civ.App. 1986) (emphasis added).
DHR testified that K.M. was not receiving any type of psychological treatment or vocational training, nor was she under any special training program at this point.
It is well settled that, when evidence is presented ore tenus, the trial court's judgment is presumed correct and will not be set aside unless the record shows the judgment to be plainly and palpably wrong. *Page 814 M.J.G.L., supra. This court is not satisfied, however, that all viable alternatives to termination of K.M.'s parental rights have been utilized. "Termination of a parent's rights in a child is an extremely drastic measure, . . . and once done, we know of no means by which those rights can be reinstated."Bowman v. State Department of Human Resources, 534 So.2d 304,307 (Ala.Civ.App. 1988) (citation omitted).
We note that the very representative of DHR who initiated the action for termination of parental rights, testified at the hearing that she saw no harm to K.M., nor the child, in allowing the situation to continue as it was at the time of the termination hearing. We further note that this is precisely what K.M. requested that the court allow. When asked at the termination hearing what she thought was in the best interest of her baby, K.M. replied, "I want the [foster parents] to get temporary custody of her until I get her. I don't want her to get adopted so I can't get her."
Subsequent to the termination hearing, and prior to entry of the August 25, 1992, order, K.M.'s attorney filed his "ARGUMENT OF COUNSEL" with the juvenile court, which states in pertinent part as follows:
 "[K.M.] could hardly support this child financially, as she is not in a position to earn any reasonable income. It seems reasonable, however, to allow the child to stay in foster care with the [foster parents] . . . and allow [K.M.]to finish school and obtain some sort of job skills, in order that she might be able to provide for the child at a later date. It seems . . . that it would be more than equitable for the Court to continue the present situation, allow [K.M.] to finish school and obtain employment, document her treatment and care for the child, and make a decision about the termination of her parental rights at some later date."
We agree. DHR has made the decision to allow K.M. to continue to reside with her grandmother. The evidence shows that since K.M. has lived near her child, she has visited, cared for, bathed, fed, and played with her. She accompanied her to church and to the doctor. Clearly, she loves her child and does not want to forever lose her.
After a thorough and careful review of the record, this court finds that the trial court's decision to terminate the mother's parental rights was premature and, therefore, its judgment was plainly and palpably wrong. Accordingly, that part of the trial court's judgment terminating K.M.'s parental rights is due to be reversed and the cause remanded for the trial court to enter an order consistent with this opinion.
REVERSED AND REMANDED WITH INSTRUCTIONS.
ROBERTSON, P.J., and THIGPEN, J., concur.