D.A. ("the mother") appeals from two judgments entered by the Calhoun Juvenile Court terminating her parental rights as to two of her children, T.A. (a daughter born in 2000) and W.A. (a son born in 2001). We affirm.
These juvenile proceedings were first initiated in April 2002 by the filing of dependency petitions by the Calhoun County Department of Human Resources ("DHR"); following a hearing in May 2002, the juvenile court awarded temporary legal and physical custody of the children to DHR. In April 2003, DHR filed petitions seeking termination of the parental rights of the mother.[1] The juvenile court held an ore tenus hearing on DHR's petitions on August 22, 2003, at which counsel for DHR, appointed counsel for the mother, and a guardian ad litem for the children appeared. A DHR social worker, a family counselor, a psychologist, and the mother testified at that hearing. The juvenile court entered its judgment on August 22, 2003; the mother filed a notice of appeal on September 5, 2003.
The mother first asserts that the juvenile court's decision to terminate her parental rights is not supported by clear and convincing evidence. Under § 26-18-7(a), Ala. Code 1975, a juvenile court is authorized to terminate parental rights upon a finding from clear and convincing evidence "that the parents of a child are unable or unwilling to discharge their responsibilities to and for the child" or "that the conduct orcondition of the parents is such as to render them unable to properly care for the child and that such conduct or condition is unlikely to change in the foreseeable future." (Emphasis added.) The Legislature has mandated that in considering whether or not a parent is unable or unwilling to discharge his or her parental responsibilities, a juvenile court must consider, among other things, whether "reasonable efforts by [DHR] . . . leading toward the rehabilitation of the parents have failed," and whether "parental rights to a sibling of the child have been involuntarily terminated." Ala. Code 1975, § 26-18-7(a)(6) and (a)(8). It is important to note that "[t]he trial court's decision in proceedings to terminate parental rights is presumed to be correct when the decision is based upon ore tenus evidence, and such a decision based upon such evidence will be set aside only if the record shows it to be plainly and palpably wrong."Ex parte State Dep't of Human Res., 624 So.2d 589, 593 (Ala. 1993); accord, Ex parte State Dep't of Human Res.,834 So.2d 117, 120-21 (Ala. 2002).
One of the witnesses who was called to testify by DHR, Dr. David R. Wilson, stated that he had performed numerous psychological tests on the mother. Wilson testified that the results of the tests indicated that the mother had an intelligence quotient (IQ) of 70. Wilson noted that although an IQ of 100 is regarded as normal, anyone with an IQ of less than 70 is generally considered to be mentally retarded and in need of institutional care. Wilson stated that although the mother was generally positive and enthusiastic, she has a very low level of mental functioning and cognitive ability. Wilson gave his professional opinion that without constant *Page 965 
supervision the mother would be unable to properly parent the children; he stated that "she would not be independently capable of caring for the children." Wilson opined that the problem was not due to the mother's lack of desire to be a good parent; rather, he believed the difficulty lay in the mother's inability to incorporate instructions regarding proper care into a permanent lifestyle. Wilson testified that the mother had made some improvements in her lifestyle but that those improvements occurred only because she worked and lived in a sheltered and supervised environment. Wilson stated that no matter how much training or instruction the mother received, based on her poor cognitive abilities, he did not believe the mother would ever be capable of rearing the children by herself.
The mother's counselor, Edith Couch, testified that she had approximately 36 counseling sessions with the mother during the 13 months before the termination hearing. She stated that she and the mother had worked on budgeting skills, coping skills, parenting skills, and problem-solving skills, as well as health, stress, and dependency issues. Couch stated that the mother had met several of her treatment goals, especially in regard to financial and budgeting matters. However, Couch agreed with Dr. Wilson that the mother was unable to "multi-task" with two children. Couch noted that the mother had consistently attended the counseling and parenting sessions. Couch testified that although the mother had learned to use appropriate discipline with the children, she did not seem to retain much of the parenting techniques between sessions. Couch stated that she believed the mother was putting forth the maximum effort to regain custody of the children but that the mother's inability to properly care for her children was based on the mother's cognitive deficits.
Additionally, the juvenile court heard corroborating testimony from DHR's social-service caseworker, Lessie Culver. Culver testified that she had been involved with the case since June 2002 and that DHR had offered the mother parenting classes, individual counseling, family counseling, child care, transportation, psychological evaluations, and drug screening, and that DHR had explored relative placements in an attempt to reunify the family. Culver noted that DHR had assisted the mother in locating shelter and employment. Culver added that although the mother had regularly utilized several of DHR's reunification services, she had been unable to cope with the young children's temper tantrums without assistance. Although the mother clearly loved the children, prepared appropriate meals for them during their visits three times a week, and even bought appropriate toys for the children, Culver stated that the mother continued to have difficulty handling the children during visits. Based upon her personal observations, Culver testified that she did not believe that the mother could ever take custody of the children without constant supervision and assistance.
As previously recounted, DHR was awarded temporary legal and physical custody of the children in the spring of 2002, and the children had been in foster care from that time until the date of the termination hearing in August 2003. Culver noted that the mother had had a total of six children, none of whom were in the mother's custody due to her inability to properly care for the children. The maternal grandmother had obtained custody of the mother's eldest child and the paternal grandmother had acquired custody of the mother's three other children born before the children at issue in this case were born. Culver stated that neither those grandparents nor any of the mother's siblings *Page 966 
had agreed to accept the two children at issue in this case because of the financial or housing problems caring for those additional children would present.
"[E]very parent has a prima facie right to the custody of his or her child[ren]" and that "right can be overcome only by clear and convincing evidence" that the termination of parental rights is in the best interests of the children. M.H.S. v. State Dep'tof Human Res., 636 So.2d 419, 420-21 (Ala.Civ.App. 1994). In order to determine the children's best interests, Alabama law clearly requires the juvenile court to consider "the parent's physical, financial, and mental abilities to care for the child[ren]." C.W. v. State Dep't of Human Res., 826 So.2d 171,172 (Ala.Civ.App. 2002); see also J.L.B. v. State Dep't of HumanRes., 608 So.2d 1367, 1368 (Ala.Civ.App. 1992). To the mother's credit, she attended parenting classes; she maintained supervised visits three times a week with the children; she held a job for eight months; she attended counseling sessions; and she furnished and paid all the utility bills on an apartment for four months before the termination hearing. On the other hand, the record contains ample evidence that the mother's mental condition renders her unable to care for the children by herself; we conclude, therefore, that the juvenile court's judgments are supported by clear and convincing evidence.
The mother also argues that her constitutional rights were violated because her parental rights were terminated as to the children, in large part, because she has a low IQ. Because this argument was not first raised in the juvenile court, we will not consider it. See C.M. v. D.P., 849 So.2d 963, 966 (Ala.Civ.App. 2002); see also S.E. v. J.D.G., 869 So.2d 1177, 1178
(Ala.Civ.App. 2003). Moreover, the mother's brief to this court fails to cite any authority in support of that argument, as is required by Rule 28(a)(10), Ala. R.App. P., and we decline to research or argue the mother's case for her on appeal. SeeWhited v. Holmes, 816 So.2d 20, 26 (Ala. 2001); see also K.H.M.v. D.L.I., [Ms. 2011216, September 12, 2003] ___ So.2d ___, ___ (Ala.Civ.App. 2003) (plurality opinion). We note, however, that Alabama caselaw and statutes regarding termination of parental rights recognize that a parent's mental ability is germane to a determination of who should receive custody of a dependent child and whether parental rights should be terminated. See C.W.,supra, and J.L.B., supra; see also § 26-18-7(a). Based on the above reasoning and authorities, the juvenile court's judgments terminating the mother's parental rights to the children are affirmed.
AFFIRMED.
YATES, P.J., and THOMPSON, J., concur.
MURDOCK, J., concurs in the result, without writing.
CRAWLEY, J., dissents, with writing.
[1] DHR also sought termination of the father's parental rights as to T.A. The father, who had moved out of state, indicated that he had no interest in the children and never responded to DHR's petition. The father is not a party to this appeal.