26 So.3d 436 (2009)
M.G.
v.
ETOWAH COUNTY DEPARTMENT OF HUMAN RESOURCES.
2080217.
Court of Civil Appeals of Alabama.
June 19, 2009.
*437 Paul R. Roberts II, Gadsden, for appellant.
Sharon E. Ficquette, chief legal counsel, and Kimberly J. Dobbs, asst. gen. counsel, Department of Human Resources, for appellee.
MOORE, Judge.
M.G. ("the mother") appeals from a judgment terminating her parental rights to her four youngest children, D.D.C., M.S.C., M.D.C., and S.C.C.[1] We reverse and remand.
*438 The mother has a long history of substance-abuse problems that have affected her ability to properly care for the children. In 1999, when D.D.C. was born, both D.D.C. and the mother tested positive for cocaine and marijuana. In 2002, the mother spent time in jail after being arrested for the distribution of crack cocaine from her home. On July 26, 2004, when S.C.C. was born, both the mother and S.C.C. tested positive for cocaine and marijuana. On February 15, 2005, after the children fell asleep, the mother left the children at home alone while she went out and got "high."
After each drug-related incident between 1999 and 2005, the Etowah County Department of Human Resources ("DHR") instituted various safety plans to prevent the permanent removal of the children from the custody of the mother. The last safety plan, which was instituted in February 2005, required, among other things, that D.S.S., the children's maternal grandmother, move in with the mother and the children to supervise the family.[2] However, that safety plan failed after the mother left the home on March 11, 2005, without explanation. The maternal grandmother indicated to DHR at that time that she could not properly care for the children without additional family assistance, and no one from either the mother's or the children's father's family came forward to help the maternal grandmother with the children. At that point, the children were placed in foster care.
At some point thereafter, the mother became compliant with DHR's requirements and the father was released from jail and attended and completed intensive outpatient-drug treatment. The children were returned to the custody of the parents on July 25, 2006, but their custody remained subject to DHR oversight. The mother tested positive for drugs in November 2006; the mother also admitted to having smoked marijuana in December 2006. In addition, DHR discovered that the mother had lied about being employed. In January 2007, the mother met with DHR and school officials to discuss behavioral problems exhibited by M.S.C. and M.D.C. After that meeting, at which the mother stated that she was a good parent and that any behavioral problems the children were exhibiting were not the product of anything going on in the family home, the mother contacted DHR and informed the family's caseworker, Monica Mostella, that she would no longer cooperate with DHR. After increasing its in-home supervision of the family to five days a week,[3] DHR met with the parents at an individualized service plan ("ISP") meeting on January 24, 2007. After the mother again displayed what DHR considered to be an uncooperative attitude, the decision was made that the mother and the father had become too unstable and noncompliant to maintain custody of the children. On January 25, 2007, the children were returned to foster care.
DHR continued to provide services to the mother. Between January and April 2007, the mother tested positive for marijuana and missed a few drug screens. In addition, the mother admitted that she had paid a child for urine to enable the mother to falsify a drug test in March 2007; she also asked that drug screens be completely terminated because she no longer wanted to be monitored. DHR established goals for the mother to obtain steady employment, *439 to obtain stable and suitable housing, and to remain sober and drug-free as verified by no positive drug screens. Mostella also indicated that, if the father was "out of the picture, it would make [the mother's] situation a lot better."
The father and the mother ended their relationship, and the mother moved out of the home she shared with the father. The mother moved in with the maternal grandmother and obtained a job with flexible hours in June 2007 cleaning a nightclub. That same month, the mother tested negative on a drug screen. Thereafter, despite undergoing numerous drug screens, the mother, who regularly attended Narcotics Anonymous meetings, never again tested positive for any controlled substance. The mother temporarily rented a home in September 2007, but she realized that she could not afford it and returned to the maternal grandmother's home.
In December 2007, DHR transferred the family's case to its termination unit. Beverly Bankston, a DHR caseworker, explained to the mother at an ISP meeting held that month that DHR intended to file a petition to terminate her parental rights. Bankston asked the mother if she needed any additional services, and the mother indicated that she did not at that time but that she would let Bankston know if she needed them in the future.
In March 2008, the mother moved into a three-bedroom, two-bath house that she rented for $400 per month. The mother paid the rent and utilities with her income from her main job of cleaning the nightclub as well as from jobs she obtained from temporary-employment agencies. The mother did not obtain gas service for the house, however, because she owed the gas company $600 for an outstanding bill that had been incurred and left unpaid by the father. The mother heated the house with electrical space heaters, and she heated water for bathing on the stove. R.T., the mother's teenage daughter, resided with her in that home without incident. R.T. attended high school, where she was an honor-roll student preparing for college admission, and she worked part time at a local fast-food franchise.
Throughout 2008 the mother continued to test negative on all drug screens. The mother missed some visitations with the children during the early part of 2008; however, after April 2008, the mother did not miss any visits. The mother continued to work, and she provided employment verification to DHR in July 2008.
DHR filed a petition to terminate the parental rights of the mother to the children on September 15, 2008. The Etowah Juvenile Court conducted a trial on the petition on October 27, 2008. At the trial, Mostella, who oversaw the family's case from October 2, 2006, to April 24, 2007, testified that, while in the mother's care, the children were happy, were well-fed, were clothed, and had made average grades in school, although they had had some discipline problems in school. Mostella testified that she would have recommended that the children be reunited with the mother if, during Mostella's tenure, the mother had successfully passed drug tests for 16 months and had acquired a steady job and a steady residence. Mostella also expressed concern that the mother might relapse into drug use as she had before. Nakesha Garrett, the DHR caseworker assigned to the family from April 2007 to December 2007, testified that she considered the mother to have acquired a stable job and a stable home because she had been working at the same place of employment since June 2007 and had been living in the same home since March 2008. Beverly Bankston, the DHR caseworker assigned to the family from January 2008 to April 2008, testified that the mother had *440 complied with the ISP requirements of finding stable housing and remaining drug-free. Talessia English, the DHR caseworker assigned to the family from August 2008 to the time of trial, testified that the period leading up to the trial was the longest period the mother had been drug-free and had maintained stable employment and stable housing. English testified as follows:
"[MOTHER'S COUNSEL]: So at this point of her having a steady job, her being drug-free, her having a living arrangement that she's been in for a while, her visiting with the children  and as far as we know the visitation is going well. The only argument that termination should happen is, well, she's messed up in the past?
"A: Yes."
English stated that she ultimately recommended permanent placement of the children outside the mother's home based on "[the mother's] history of substance abuse."
Willis Estis, a licensed professional counselor who was called as an expert witness by DHR, testified that, when he evaluated the mother in 2003, he believed she had developed a "resentful, rebellious, and nonconforming" impulsive personality that would prevent her from benefiting from past experience and that, without external controls, the mother had a poor prognosis for recovery and would likely revert back to her previous lifestyle. However, Estis also testified that, in the past, he had observed patients overcome drug-abuse problems after he had originally predicted that they had no hope of recovery. As a result, Estis agreed that it was possible the mother could conquer her drug problem. Estis stated that he had not seen the mother since June 2006 and that "the more important thing would be the history of what's been happening during that period of time." When informed that the mother had not used drugs in 16 months, Estis testified that he considered that a "very positive thing" and indicative of the possibility that the mother would continue her sobriety. Estis admitted that, without a more recent evaluation, he could not give an opinion whether the mother was a suitable person to assume custody of the children at the time of the trial.[4]
Clara Williams, a visitation supervisor for Sorage, a business retained by DHR to arrange and monitor the mother's visits with the children, testified that the children interact well with the mother and R.T. and that she had never seen the mother endanger the children during visits. R.T. testified that when the father lived with the family, the mother had taken care of the children, following a structured schedule, and that the family had been happy. R.T. admitted that drugs had been prevalent when the father lived with the family; she also stated that the mother had since extricated herself from the father, that the mother did not have any current romantic relationship, and that the mother had changed for the better. R.T. stated that she helped the mother some financially with money she earned from her part-time work and that she would assist the mother in caring for the children if they were reunited. The maternal grandmother testified that she had reported the mother to DHR in the past for drug use, but she also testified that she believed the mother had improved her circumstances, *441 in large part, by leaving the father and by her newfound ability to handle emotional pressure without resorting to drugs. The maternal grandmother testified that the mother deserved to have the children returned to her custody. The maternal grandmother pointed out that the mother had purchased a reliable automobile and had rented a suitable house. According to the maternal grandmother, the mother no longer required the maternal grandmother's assistance to pay her bills.
The mother testified that she had finally rehabilitated herself in the spring and summer of 2007 because she loved being a mother and because she missed her children. The mother also said that she wanted to be respected by others and that she had learned that drug addicts are not respected. In addition, although the mother said she could not blame the father for all of her poor choices, the mother explained that her decision to end her relationship with the father had aided her in taking the necessary steps to improve her life. The mother indicated that she had done everything she could to accomplish the goals set for her by DHR. As for there being no gas service to her home, the mother testified that she would have already paid the $600 bill to initiate service but for the expenses she had incurred in this case. Nevertheless, she stated that she would take out a loan to pay the bill if she needed to do so in order to obtain custody of the children. The mother testified that, out of the approximately $1,190.75 per month she earns, she spends monthly $400 on rent, $147 to $148 for power, $45 for water, $86 to $90 for cable television, $60 for cellular-telephone service, and $400 to $450 for groceries. The mother also testified that if she obtained custody of the children she would be eligible for food stamps.
After the trial, the juvenile court entered a judgment terminating the parental rights of the mother, citing the mother's history of substance abuse and her current financial condition. The mother appeals that judgment, arguing first that DHR failed to present clear and convincing evidence of current conditions indicating that she could not properly care for the children. She further argues that the juvenile court erred when it determined that there was no viable alternative to termination of her parental rights. We do not address the second issue because we find resolution of the first issue to be dispositive.
"A juvenile court is required to apply a two-pronged test in determining whether to terminate parental rights: (1) clear and convincing evidence must support a finding that the child is dependent; and (2) the court must properly consider and reject all viable alternatives to a termination of parental rights. Ex parte Beasley, 564 So.2d 950, 954 (Ala.1990)."
B.M. v. State, 895 So.2d 319, 331 (Ala.Civ. App.2004). In order to find a child dependent, the juvenile court must find that grounds for termination exist. Ex parte Beasley, 564 So.2d 950, 954 (Ala.1990). The statutory grounds for termination are found in Ala.Code 1975, § 26-18-7(a), which provides, in pertinent part:
"If the court finds from clear and convincing evidence, competent, material, and relevant in nature, that the parents of a child are unable or unwilling to discharge their responsibilities to and for the child, or that the conduct or condition of the parents is such as to render them unable to properly care for the child and that such conduct or condition is unlikely to change in the foreseeable future, it may terminate the parental rights of the parents."
As explained by this court, "the existence of evidence of current conditions or conduct relating to a parent's inability *442 or unwillingness to care for his or her children is implicit in the requirement that termination of parental rights be based on clear and convincing evidence." D.O. v. Calhoun County Dep't of Human Res., 859 So.2d 439, 444 (Ala.Civ.App.2003). That principle derives from the wording of the operative statute, which provides, in pertinent part, that parental rights may be terminated when "the conduct or condition of the parents is such as to render them unable to properly care for the child and that such conduct or condition is unlikely to change in the foreseeable future." § 26-18-7(a) (emphasis added). Although "[a] court may consider the past history of the family, as well as evidence of its present conditions," Ex parte State Dep't of Human Res., 624 So.2d 589, 593 (Ala.1993), based on the plain language of the statute, and as clarified by our caselaw, the mere fact that, at one time, the parent may have committed conduct or suffered from a condition that rendered the parent unable to properly care for the child does not authorize a juvenile court to terminate parental rights. See V.M. v. State Dep't of Human Res., 710 So.2d 915, 921 (Ala.Civ. App.1998). Rather, the test is whether DHR has presented clear and convincing evidence demonstrating that the parental conduct or condition currently persists to such a degree as to continue to prevent the parent from properly caring for the child.[5]See id.
Section 26-18-7(a)(2), Ala.Code 1975, requires juvenile courts, when deciding whether grounds for termination exist, to consider, among other things, "excessive use of alcohol or controlled substances, of such duration or nature as to render the parent unable to care for the needs of the child." In this case, at the time of trial, the mother had abstained from using *443 drugs for over 16 months, as was established both by her testimony and by the multiple negative drug-test results she had produced. DHR presented absolutely no evidence indicating that, at the time of the trial, the mother was using any controlled substances, much less that the mother was using illegal drugs in such a manner as to render her unable to properly care for the children.
The evidence indicates that the mother meets all the needs of the children when she is not abusing drugs. Nevertheless, DHR maintained through its witnesses at trial that the mother's parental rights should be terminated out of fear that the mother would resume using drugs as she had done in the past. However, DHR did not present any evidence from the drug-rehabilitation professionals who had treated the mother regarding the depth of the mother's drug addiction or the extent of her recovery. One of DHR's witnesses testified that the mother had never stopped using drugs for as long as 16 months before. DHR did not introduce any reports or elicit any testimony from any witness indicating that the mother's current 16-month abstinence should not be considered a reliable indicator of her commitment to ending her drug problem altogether. In short, DHR produced no evidence indicating that relapse was so likely or imminent that the mother should have been considered as having a current drug problem that interfered with her ability to properly care for the children.
Given the undisputed evidence indicating that the mother had not used drugs since June 2007, and further given the lack of any negative testimony regarding the effect of the mother's drug-rehabilitation efforts, the record does not contain evidence from which the juvenile court reasonably could have been clearly convinced that the mother suffers from an ongoing drug-addiction "condition" or exhibits drug-use "conduct" that prevents her from properly caring for her children.
As set out above, the testimony of the DHR caseworkers themselves established that, by the time of the trial, the mother had also resolved any and all other problems identified by DHR as obstacles to family reunification. However, in its final judgment, the juvenile court found that the mother, at the time of the trial, "still did not have the gas service on her home turned on (for heat and hot water) and did not have income sufficient to support herself and her four children." It is undisputed that the mother did not have gas service due to nonpayment of an approximate $600 bill incurred by the father that was placed on the mother's account. The mother compensated for that missing service by using electric space heaters to heat the home and by heating water on the stove for bathing. DHR presented no evidence indicating that those compensatory devices would endanger the children in any way. The absence of gas heat, as opposed to electric heat, does not obviously impair the mother's ability to properly care for the children. In fact, the evidence shows that the mother's 17-year-old daughter was thriving under those living arrangements, earning good grades while working part time and preparing for college. In any event, the mother indicated, without contradiction, that she could remedy that problem by obtaining a loan to pay the bill if the children were returned to her custody.
As for the mother's income, DHR presented no evidence indicating that the mother would be unable to properly clothe, feed, shelter, educate, and care for the children based on her income and supplemental governmental benefits. Although it would be preferable if the mother had ongoing gas service to heat her *444 home and water, and although it would be better if the mother had a higher income to provide a higher standard of living for the children, the mere fact that the mother has only a limited income and must improvise to provide for the children due to financial constraints does not render her unable to properly care for the children. As this court has repeatedly held, poverty alone is not enough to warrant the termination of parental rights. See, e.g., S.K. v. Madison County Dep't of Human Res., 990 So.2d 887 (Ala.Civ.App.2008); D.A. v. Calhoun County Dep't of Human Res., 892 So.2d 963, 968 (Ala.Civ.App.2004); C.B. v. State Dep't of Human Res., 782 So.2d 781 (Ala.Civ.App.1998); Bowman v. State Dep't of Human Res., 534 So.2d 304 (Ala. Civ.App.1988); In re Hickman, 489 So.2d 601, 602-03 (Ala.Civ.App.1986); and K.M. v. Shelby County Dep't of Human Res., 628 So.2d 812, 813 (Ala.Civ.App.1993). In the absence of any evidence of current aggravating conditions, conduct, or circumstances, the mother's limited income does not afford grounds for terminating her parental rights.
Because the record does not contain evidence that a fact-finder reasonably could find to clearly and convincingly establish that the mother's current conduct or condition renders her unable to properly care for the children, see J.B. v. DeKalb County Dep't of Human Res., 12 So.3d 100 (Ala. Civ.App.2008), the judgment terminating her parental rights is due to be reversed. The case is hereby remanded for the juvenile court to conduct further proceedings consistent with this opinion.
REVERSED AND REMANDED.
BRYAN, J., concurs.
THOMPSON, P.J., concurs in the result, without writing.
PITTMAN, J., dissents, without writing.
THOMAS, J., dissents, with writing.
THOMAS, Judge, dissenting.
I must respectfully dissent. M.G. ("the mother") had improved her circumstances after losing custody of her children for the second time and after being informed that the Etowah County Department of Human Resources ("DHR") was planning to terminate her parental rights. DHR had a long history with the mother, having instituted safety plans on at least three occasions before the children were first removed from the mother's care and placed in DHR's legal custody in March 2005. DHR based its decision to seek termination of the mother's parental rights on her repeated inability to meet the needs of her children without supervision and DHR intervention.
DHR also based its decision to seek termination on the psychological evaluation of the mother performed in June 2006 by Willis Estis, a licensed professional counselor. His report was introduced into evidence. Estis interviewed the mother and administered the Minnesota Multiphasic Personality Inventory-2 (MMPI-2) test and the Shipley Institute of Living Scale test. Those tests indicated that the mother was in the low average range of intellectual functioning and that the mother "tends to be resentful, rebellious, and nonconforming." Estis noted that the mother would be inclined to respond impulsively and that she would not benefit from experience. In other words, Estis explained, the mother would not learn from her mistakes but would instead repeat them. Estis thought that, if well supervised, the mother could effectively parent the children. According to Estis, the mother would respond to external controls placed upon her, but he opined that, without those controls, the mother would be likely to *445 return to her old patterns and habits. Estis suggested that the mother be subjected to random drug tests for an extended period and that she be provided with counseling to educate her about the addictive process. However, Estis concluded that the prognosis for long-term recovery in the mother was poor.
The mother had made recent progress toward meeting the goals set out in her individualized service plan ("ISP"). She had been drug-free for over one year, and she had maintained employment, although her employment provided income that did not appear to be sufficient for the mother to meet all of her expenses were she to have four additional children to feed and clothe. However, test results and Estis's testimony indicated that the mother's personality was one that responded to external controls on her behavior, and Estis opined that the mother's impulsive behavior and harmful patterns would likely return once the mother was no longer controlled by things like DHR supervision or random drug tests. Notably, the mother had been subject to those controls for the entire 16-month period of sobriety. Although Estis admitted that the mother's reported progress was encouraging, he had not seen her since 2006 and could not offer an opinion on whether she would be a suitable parent at the time of the termination trial. However, Estis's earlier prognosis was borne out by the mother's behavior after the children were first returned to her in 2006. The mother began to use drugs again and became increasingly resistant to DHR intervention. Thus, the progress the mother had made is tempered by the earlier attempt to reunite the family and the apparent correctness of Estis's predictions regarding the mother's behavior patterns.
Because I believe that DHR did prove that the mother, although currently meeting ISP goals, had repeatedly failed to maintain progress toward being able to meet the responsibilities of parenting, I would affirm the judgment terminating the mother's parental rights.
NOTES
[1] That judgment also terminated the parental rights of B.M.C., the father of the children. The father has not appealed.
[2] The children's father apparently was incarcerated at this time.
[3] An organization known as "Youth Villages" advocated for keeping the family united and provided in-home services for the family at the request of DHR.
[4] DHR also called D.T., the children's paternal grandmother, as a witness adverse to the mother. However, D.T. testified that she had not been around the mother in two or three years and that she therefore had no firsthand knowledge of the current condition of the mother.
[5] During the trial, the following colloquy occurred:

"[MOTHER'S COUNSEL]: As [the mother] sits here today, what testimony do you have that says she's unable to care for her children?
"[TALESSIA ENGLISH]: I'm not really sure what you're asking me.
"[MOTHER'S COUNSEL]: Well, I mean, at the present moment, as we sit here today, what argument is there that her ability to take care of the childrennot your belief of her going to backslide or anything like that. But her ability at this point today, what would you state is herthe excuse that she's unable to take care of her children?
"[GUARDIAN AD LITEM]: Judge, I'm going to object. I think this is repetitious and covering ground we've already covered.
"[MOTHER'S COUNSEL]: I'm asking for present today.
"[COURT]: Again, the point is the children are not in her care, therefore, the question is speculative, and I'll sustain the objection.
"[MOTHER'S COUNSEL]: Okay.
"[COURT]: Because they haven't been in her physical custody since January of '07.
"[MOTHER'S COUNSEL]: That's the question I'm asking.
"[MOTHER'S COUNSEL]: Is there something that you, as the caseworker at the present time, can saygive an exact reason of her inability to take care of the children?
"[COURT]: She's not. She is not caring for them at the present time.
"[DHR'S COUNSEL]: Judge, if that was the standard, I mean, we'd never be able to prove the petition.
"[COURT]: That's not the standard."
To the extent that the juvenile court ruled that DHR did not have the burden of proving the mother's present inability to properly care for the children because she had not had physical custody of the children for a long period, the juvenile court erred as a matter of law. As stated infra, in a termination-of-parental-rights case, DHR bears the burden of proving by clear and convincing evidence that a parent's current conditions prevent the parent from properly caring for the child. The fact that the child is not in the physical custody of the parent does not relieve DHR of that burden.