PITTMAN, Judge.
A.K. (“the mother”) appeals from a judgment of the Henry Juvenile Court terminating her parental rights as to N.K. (“the child”).
The child was born on March 29, 2009. On May 7, 2009, the Henry County Department of Human Resources (“DHR”) became involved in this matter after re *69 ceiving a report of child neglect. As a result of DHR’s investigation, DHR implemented a safety plan that included placing the child in the custody of his maternal grandmother; the mother was also living in the home of the maternal grandmother. In May 2009, DHR and the mother collaborated to develop an Individualized Service Plan (“ISP”) for the mother. The safety plan was terminated in June 2009 after the maternal grandmother and the mother had violated its terms. The child was then adjudicated dependent and placed in foster care. On September 7, 2010, DHR petitioned to have the mother’s parental rights terminated as to the child. Following an ore tenus hearing, the juvenile court entered a judgment terminating the mother’s parental rights on December 8, 2010. The mother thereafter timely appealed.[1] On appeal, the mother argues that DHR did not present clear and convincing evidence sufficient to support the juvenile court’s termination of the mother’s parental rights.
The standard of review applied by appellate courts in reviewing the propriety of decisions to terminate parental rights is well established. “The trial court’s decision in proceedings to terminate parental rights is presumed to be correct when the decision is based upon ore tenus evidence, and such a decision based upon such evidence will be set aside only if the record shows it to be plainly and palpably wrong.” Ex parte State Dep’t of Human Res., 624 So.2d 589, 593 (Ala.1993). That “presumption is based on the trial court’s unique position to directly observe the witnesses and to assess their demeanor and credibility.” Ex parte Fann, 810 So.2d 631, 633 (Ala.2001).
This court has explained the juvenile court’s authority to terminate parental rights as follows:
“‘The right to maintain family integrity is a fundamental right protected by the due process requirements of the Constitution. Pursuant to this right, Alabama courts recognize a presumption that parental custody will be in the best interests of a child. This prima facie right of a parent to the custody of his or her child can only be overcome by clear and convincing evidence that permanent removal from the parent’s custody would be in the child’s best interest.... In making that determination, the court must consider whether the parent is physically, financially, and mentally able to care for the child. If the court finds from clear and convincing evidence that the parent is unable or unwilling to discharge his or her responsibilities to and for the child, his or her parental rights can then be terminated.... ’
“Bowman v. State Dep’t of Human Res., 534 So.2d 304, 305 (Ala.Civ.App.1988) (citations omitted). The trial court’s decision to terminate parental rights, which is based on evidence presented ore tenus, is presumed correct and will be reversed only if the record demonstrates that the decision is unsupported by the evidence and is plainly and palpably wrong. R.B. v. State Dep’t of Human Res., 669 So.2d 187 (Ala.Civ.App.1995).
“To terminate parental rights, the trial court must first determine from clear and convincing evidence that the child is dependent. S.F. v. Dep’t of Human Res., 680 So.2d 346 (Ala.Civ.App.1996). The trial court must then determine that *70 there exists no alternative to termination. L.A.G. v. State Dep’t of Human Res., 681 So.2d 596 (Ala.Civ.App.1996).”
M.W. v. Houston Cnty. Dep’t of Human Res., 773 So.2d 484, 485-86 (Ala.Civ.App.2000).
The juvenile court’s decision whether to terminate a parent’s parental rights is guided by Ala.Code 1975, § 12-15-319, which became effective January 1, 2009. Section 12-15-319 provides, in pertinent part, as follows:
“(a) If the juvenile court finds from clear and convincing evidence, competent, material, and relevant in nature, that the parents of a child are unable or unwilling to discharge their responsibilities to and for the child, or that the conduct or condition of the parents renders them unable to properly care for the child and that the conduct or condition is unlikely to change in the foreseeable future, it may terminate the parental rights of the parents. In determining whether or not the parents are unable or unwilling to discharge their responsibilities to and for the child and to terminate the parental rights, the juvenile court shall consider the following factors including, but not limited to, the following:
[[Image here]]
“(2) Emotional illness, mental illness, or mental deficiency of the parent, or excessive use of alcohol or controlled substances, of a duration or nature as to render the parent unable to care for the needs of the child.
[[Image here]]
“(7) That reasonable efforts by the Department of Human Resources or licensed public or private child care agencies leading toward the rehabilitation of the parents have failed.
[[Image here]]
“(9) Failure by the parents to provide for the material needs of the child or to pay a reasonable portion of support of the child, where the parent is able to do so.
“(10) Failure by the parents to maintain regular visits with the child in accordance with a plan devised by the Department of Human Resources, or any public or licensed private child care agency, and agreed to by the parent.
“(11) Failure by the parents to maintain consistent contact or communication with the child.
“(12) Lack of effort by the parent to adjust his or her circumstances to meet the needs of the child in accordance with agreements reached, including agreements reached with local departments of human resources or licensed child-placing agencies, in an administrative review or a judicial review.”
It is also well recognized that, “[a]t some point, ... the child’s need for permanency and stability must overcome the parent’s good-faith but unsuccessful attempts to become a suitable parent.” M.W., 773 So.2d at 487 (affirming a judgment terminating parental rights of a mother who had made diligent efforts to visit her child and to comply with the Houston County DHR’s requests but had failed to establish a home and get a job over a period longer than three years); see also Talladega Cnty. Dep’t of Human Res. v. M.E.P., 975 So.2d 370 (Ala.Civ.App.2007) (holding that clear and convincing evidence mandated termination of parental rights when the children had already been in foster care for two and one-half years and would need to stay in foster care for additional months because their parents’ drug addictions and drug-related incarcerations had prevented them from being able to immediately establish a *71 home and get a job, as required in order to be able to reestablish a familial relationship with the children). Applying the appropriate standard of review and the aforementioned principles of law, we address the merits of the mother’s appeal.
The record shows that, on May 7, 2009, the maternal grandmother filed a report alleging that the mother had not been taking care of the child, that she lacked basic parenting knowledge, that she did not have basic necessities such as diapers or clothing, that she had not taken the child to medical appointments in accordance with medical recommendations, and that she had not had the child’s pharmaceutical prescriptions filled. DHR had also received reports that the mother had been seen walking with the child in a stroller during both “the heat of the day” and in “rainy weather”; that the mother would leave the child with others for extended periods and would not return at the time that she had said she would; and that she had been “partying with [the child] present,” had been “out all night drinking,” and had been “smoking marijuana.”
Coincidentally, the mother was in DHR’s office at the time that the maternal grandmother’s report was filed, because, the evidence indicated, she was applying for food stamps or other assistance; DHR both met with the mother that day and visited the maternal grandmother’s home, where the mother was living with the child at the time. As a result of its investigation, DHR implemented a safety plan, and, pursuant to that safety plan, the child was placed in the custody of the maternal grandmother. However, that safety plan was terminated after the maternal grandmother violated its terms by allowing the mother to have an unsupervised overnight visitation with the child at the home of the mother’s then boyfriend in June 2009, just over a month after the plan had been put in place.
The ISP, which DHR and the mother had devised on May 11, 2009, included nine goals that “[the mother] was to work towards in an effort to regain custody of [the child].” Those goals included: undergoing both a psychological evaluation and psychological counseling; obtaining a general equivalency diploma (“GED”); obtaining employment; obtaining safe and affordable housing; obtaining the ability to provide basic parenting to the child and to provide for the needs for the child; and refraining from using drugs and engaging in criminal conduct. DHR and the mother met on five different occasions to review the terms of the ISP: on June 11, 2009, June 25, 2009, October 14, 2009, April 13, 2010, and October 6, 2010.
When DHR filed its petition to terminate the mother’s parental rights in September 2010, it averred that the child had been in foster care for more than 12 months; that the mother had “continue[d] to live an unstable life with no visible means of supporting herself or the ... child”; that the mother had failed to make any “progress toward self-sufficiency or stability” since DHR had begun working with her in May 2009; that “[DHR] ha[d] considered less drastic measures without success,” including relative placement; and that reasonable efforts to rehabilitate the mother had failed. The record on appeal includes a DHR report dated November 24, 2010, which was addressed to the juvenile court; in that report, DHR documented the mother’s efforts toward each goal identified in her ISP and opined that two goals had been “partially completed,” but it noted that other goals had been deemed “not completed.” Additionally, the record includes a transcript of the ore tenus hearing held on November 29, 2010, during which the court-referral officer assigned to *72 the mother’s case, the DHR caseworker assigned to the case, and the mother testified.
The record reveals that DHR concluded that the mother had partially completed her goal of undergoing a psychological evaluation and counseling. The record shows that the mother began receiving treatment from Spectra Care in either July or August 2009, but the DHR caseworker testified that the mother’s receipt of treatment from that time through November 2010 had been “sporadic at best.” In April 2010, the mother was diagnosed as having a major depressive disorder, as having been a victim of sexual abuse as a child, and as suffering from mental retardation of an unspecified severity. The DHR report indicated that the mother had been prescribed medication for her depression but that she had reported to the caseworker that she did not take her medication regularly as prescribed.
The record also reveals that DHR concluded that the mother had partially completed her goal of attending the weekly scheduled visitation with the child. The record shows that the mother did not consistently attend the visitation sessions. DHR’s report indicates that DHR had rescheduled her visits and had offered to bring the child to locations that were convenient for the mother; specifically,. the report stated that the mother had requested that the visitations, which were originally scheduled for 8:30 a.m., be moved to the afternoon because, the report alleged, the mother had told representatives of DHR that she was not a “morning person.” The record also indicates that DHR had provided transportation to the mother for the visitations and that she was often late or not ready to be picked up on time. The mother, however, testified that her inability to attend visitations with the child had simply been caused by her lack of transportation.
The record undisputedly shows that the mother did not complete her goal of obtaining a GED. The record further reveals that, although the mother did enroll in GED classes, the caseworker testified that, to her knowledge, the mother “had ... attended not one class,” and that “[the mother] would show up when class was about to be over.”[2] The caseworker further testified that “[the mother] would constantly tell [the caseworker] that [she was] going to school[,] ... [that she was] doing her homework, [and that she was] doing her lesson.” The caseworker stated that the mother had expressed an interest in taking a GED course on the Internet but that the mother had nonetheless led her to believe “that she was actually going to GED classes.” Moreover, the record contains no evidence indicating that the mother took any classes on the Internet. The mother testified that she had tried to attend the GED classes but that she had “worried] about what people ... would say about [her b]ecause [she had] been doubted all [of her] life.”
The record contains undisputed evidence indicating that the mother had not made progress in obtaining safe and affordable housing. The maternal grandmother had asked the mother to move out of her home in May 2009, after which the mother moved in with her then boyfriend and his mother until November 2009. The mother rented a two-bedroom mobile home from November 2009 until August 1, 2010, at which time she was evicted as a result of difficulty paying rent and bills; DHR’s *73 report stated that police officers had been called to the home “on numerous occasions” regarding domestic disputes. The mother testified that she had taken good care of the home, but she admitted that the water had been turned off at one point while she had lived there. Between the time that she was evicted and November 14, 2010, the mother lived on and off with her former boyfriend and his mother, and she lived for approximately one month in a hotel with a male, whom she described as a “friend.” The caseworker testified that the mother had spent a few nights with her aunt as well. On November 14, 2010, the mother was arrested and placed in the Houston County Jail on a no-bond status because she had failed to pay fines and court costs that she owed. The caseworker testified that she had taken the mother to Barbour County to apply for government-assisted housing when DHR had first become involved in the case; that application appears to be the only instance where the mother sought any form of government-housing assistance.
The record reveals that the mother and DHR disagree as to whether the mother made efforts toward obtaining employment. DHR’s report states that that goal was not completed. The record reveals that the mother had worked unsuccessfully as a cosmetics-sales representative for a short period, and that she had thereafter worked as an entertainer at an exotic dance club for two or three months, but that her employment had ended when the club owner was forced to terminate the employment of all the dancers. The record further shows that DHR had assisted the mother in applying for Supplemental Security Income (“SSI”) benefits based on her low intellectual capacity and mental diagnosis. At the time DHR filed its petition to terminate the mother’s parental rights and at the time of trial, the mother’s application was still pending.
The record shows that DHR concluded that the mother had not demonstrated the basic parenting skills and the ability to provide for the child’s basic needs, including stability. The mother was supposed to enroll in parenting classes, but she never did; it appears that the mother was ineligible to enroll in one of the two programs in which she was encouraged to participate because it involved a DHR caseworker working together with a new mother in a home with the pertinent child and, at that time, the mother did not have a home or custody of the child. The caseworker testified that the only form of child support provided by the mother had been a payment of $50. The mother testified that she had sent clothes and a Christmas present to the child, and that she had thrown a birthday party for him. The caseworker further testified that she had no personal knowledge that, while in the custody and under the care of the mother, the child had been in any real danger. However, the caseworker explained, the child had been unhealthy at the time he was placed in the custody of DHR; she stated that the mother had missed two doctors’ appointments within the first 21 days after the child was born and that the mother had not filled his pharmaceutical prescriptions. Those appointments that the mother had missed were follow-up appointments that had been scheduled because results of the child’s blood tests, taken when he was born, had concerned his doctors. The mother testified that she loved the child and wanted a second chance to be a parent. The caseworker testified that DHR had scheduled appointments for the mother at the WISE Center, an entity that helps mentally retarded parents gain parenting skills, and that the mother had never attended those appointments; the mother testified that the WISE Center had never been mentioned to her as a resource, *74 but she admitted that she had been instructed to enroll in parenting classes.
The record contains undisputed evidence indicating that the mother failed to refrain from using illegal drugs and from engaging in criminal activity. DHR summarized that, since her ISP was first devised, the mother had been named as the aggressor in domestic disputes; had been arrested four times on charges of obstruction of justice (giving police a false name), public intoxication, disorderly conduct, and failure to appear in criminal court; and had failed drug tests. The court-referral officer, who had administered the mother’s drug tests, testified that the mother had failed drug tests in January 2010, February 2010, March 2010, and June 2010; he stated that she had passed only two of the tests that he had given her, in April 2010 and May 2010. During the mother’s testimony, the juvenile-court judge asked the mother directly whether she had been “clean” for more than 80 days and whether she would be able to pass a drug test if given one that day; the mother responded that she thought so, but she noted that she had been around other people smoking a purportedly legal form a marijuana earlier in the month. Following a short recess, a drug test administered to the mother that day revealed traces of marijuana in the mother’s body. At that time, the mother admitted to the juvenile court that she had smoked marijuana the week before, just before having been taken into custody at the Houston County Jail.
At trial, the caseworker testified that DHR had looked into relative placement as an alternative to terminating the mother’s parental rights, but she stated that there were no viable alternatives to termination. Moreover, the mother offered no potential relative resources during trial.
The record contains undisputed evidence indicating that the mother has a limited intellectual capacity. The results of the mother’s psychological evaluation conducted in November 2009 revealed an intelligence-quotient (“IQ”) score of 62, which places her in the lower half of the “intellectual-deficit” range of intellectual abilities. The court-referral officer opined that the mother “was intent on wanting to” achieve the goals set in her ISP, but he stated that he “[did not] really think she was capable of doing them.” He further testified that the mother “appeared to be functional” and “intelligent enough to understand what [they had] talked about.” However, he stated that he did not think that she could follow through with things that she needed to do.
The caseworker testified that she had realized early in working on the case that the mother was unlikely to be able to reach the goals outlined in her ISP because, she said, “[the mother] does not have the mental/intellectual ability to be able to take care of [the child].” Specifically, the caseworker opined that she “[did not] even think [the mother was] capable of getting a GED” or of learning basic parenting skills. The caseworker stated that “[the mother had] tried, as best her ability [had] allow[ed] her to,” to accomplish the ISP goals, but she opined that the mother’s ability to do those things necessary to regain custody of the child was limited because of her low IQ.
The caseworker clarified that it was not DHR policy to remove children from homes where a parent had an IQ within the mental-retardation range and that, in fact, some parents with IQs similar to the mother’s had been able to maintain custody of their children. Additionally, the caseworker testified that she had worked with DHR for two years and that this case was the first time she had ever dealt with a parent whose IQ fell in the mental-retardation range while working for *75 DHR;[3] nonetheless, the caseworker stated that, although she had done her best in trying to rehabilitate the mother, the mother simply lacked the physical or the financial ability to care for the child. When asked whether she had sought assistance from agencies that help mentally retarded parents gain parenting skills, she stated that she had made appointments for the mother at the WISE Center but that the mother had not kept those appointments.
In her brief, the mother contends that, because evidence was adduced indicating that “the child was [n]ever in danger when [she was] with the mother” and that DHR had set up an ISP that was impossible for the mother to fulfill, DHR failed to show that the mother’s circumstances were such that she could not be rehabilitated so as to be able to regain custody of the child. The mother argues that the termination of her parental rights was premature, given the goals in the ISP and the fact that the child was removed from her custody at the age of 21 days. The mother relies on three cases in which this court has reversed a juvenile court’s judgment terminating parental rights on the ground that the termination was premature: R.F. v. State Dep’t of Human Res., 740 So.2d 1093, 1094-95 (Ala.Civ.App.1999), K.M. v. Shelby Cnty. Dep’t of Human Res., 628 So.2d 812 (Ala.Civ.App.1993), and T.D.M.V. v. Elmore Cnty. Dep’t of Human Res., 586 So.2d 931 (Ala.Civ.App.1991).
In R.F., 740 So.2d at 1094-95, we reversed a judgment terminating parental rights when a parent had not been alleged to have abused or neglected the child and when the termination claim had been prosecuted by the guardian ad litem over the objection of the Cullman County DHR; we held that the termination had been premature because the mother, who was 15 years old and was herself in the custody of the Cullman County DHR, had not yet had the opportunity to be a parent. Similarly, K.M. also involved a mother who was in foster care at the time she had the pertinent child; in that case, we reversed the termination of the mother’s parental rights because, despite the mother’s irresponsible behavior, the mother had visited the child daily; had expressed a desire to finish school but had not been given the opportunity to do so; and had developed a relationship with the child by bathing, feeding, and taking the child to the doctor and to church regularly. In T.D.M.V., the children’s maternal grandmother had indicated a willingness to help the mother care for the children, but no one had ever been to her home to investigate her as a source for relative placement; we held that, “[w]hile the record [did] not indicate that the mother [was] a model parent, there was evidence ... that the mother wanted to improve her situation in order to reunite with her children.” 586 So.2d at 933.
We begin by rejecting the mother’s argument that the termination in this case was premature. Although it is true that DHR became involved in this case when the child was 21 days old, the child was placed in foster care on June 25, 2009, when the child was almost 3 months old. DHR did not immediately place the child in foster care; instead, it placed the child in the custody of the maternal grandmother, in whose home both the mother and the child were living at the time. DHR’s implementation of that safety plan was hardly a drastic move, and DHR certainly did not deprive the mother of an opportunity to demonstrate whether she was fit to be a parent.
*76 Additionally, the facts of this case are distinguishable from the facts of the cases cited in the mother’s brief. R.F. and K.M. involved mothers who had demonstrated a desire to acquire those skills necessary to provide for their children but who had been prevented from doing so because of the mothers’ young ages. In both cases, 'there was no evidence indicating that they would not be able to provide for their children if given the opportunity to do so. T.D.M.V. is also distinguishable from this case because, in that case, the evidence revealed that the mother’s difficulty finding a job and housing was largely due to her lack of transportation. Additionally, in T.D.M.V., at the time of trial, the mother had obtained employment. It was further shown that the Elmore County DHR had not exhausted all viable alternatives to termination of the mother’s rights as to the children because the maternal grandmother in that case had testified that she had expressed a willingness to help the mother raise the children but had never been contacted or investigated by the Elmore County DHR.
In this case, the mother made no effort to enroll herself in parenting classes, despite her testimony that she knew DHR expected her to do so if she wanted to regain custody of the child. The mother also did not consistently receive counseling as she had been instructed to do. The mother, after being evicted in August 2010, also made no effort to obtain safe and affordable housing; instead, the mother seems to have bounced back and forth between male “friends.”
In her brief, the mother claims that to affirm a decision to terminate a parent’s rights when that parent had only partially achieved “unrealistic goals” would set “a dangerous precedent.” The mother’s argument wholly fails to account for evidence indicating her own lack of effort exerted toward achieving the goals in her ISP. Although the mother argues that obtaining a GED was an unrealistic goal, the record reflects that she never attended any classes; moreover, the caseworker testified that, when she had discussed the topic of GED classes with the mother, the mother had never expressed discontent or frustration but had instead lied about having attended lessons and having done homework. The juvenile court could properly have deemed the mother’s lack of effort indicative of her unwillingness to act in the interest of regaining custody of the child.
Perhaps the most compelling evidence in the record supporting the juvenile court’s judgment, which evidence is also entirely unaddressed by the mother in her brief on appeal, is the evidence of the mother’s drug use. The mother continued to use marijuana throughout the entire period the child was in DHR custody, failing four of six drug tests, all the while admittedly being aware that doing so would be viewed adversely against her in a bid to regain custody of her child.
In her brief, the mother appears to overlook the well established law in Alabama that a juvenile court is required to evaluate “the parent’s physical, financial, and mental abilities to care for the child.” C.W. v. State Dep’t of Human Res., 826 So.2d 171, 172 (Ala.Civ.App.2002). We have recognized that “a parent’s mental ability is germane to a determination of who should receive custody of a dependent child and whether parental rights should be terminated.” D.A. v. Calhoun Cnty. Dep’t of Human Res., 892 So.2d 963, 966 (Ala.Civ.App.2004). In D.A., we affirmed a judgment terminating a mother’s parental rights when the record supported a finding that the mother’s mental condition prevented her from raising her children by herself. 892 So.2d at 966. In that case, the record showed that “[the mother] at *77 tended parenting classes; ... maintained supervised visits three times a week with the children; ... held a job for eight months; ... attended counseling sessions; and ... furnished and paid all the utility bills on an apartment for four months before the termination hearing.” 892 So.2d at 966. In D.A., the mother demonstrated a much more sincere desire to raise her children and put forth a more substantial effort than the mother in this case. It is further notable that, in D.A., the mother had a measured IQ of 70 (a figure somewhat higher than the IQ of the mother in this case).
Here, the record adequately supports the conclusion that the mother’s failure to achieve the goals set forth in her ISP was not predetermined by her circumstances but, rather, was the result of her lack of effort and could even be viewed as demonstrative of an indifference toward her responsibilities and the law. In light of the evidence of the mother’s drug use, her failure to attend GED classes, her prevarication in reporting to DHR her progress in obtaining her GED, her failure to enroll in parenting classes, her failure to make progress toward securing appropriate housing, and her limited intellectual capacity, we hold that the juvenile court’s judgment terminating the mother’s parental rights is properly supported by the record.
AFFIRMED.
THOMPSON, P.J., and BRYAN, THOMAS, and MOORE, JJ., concur.

. The juvenile-court judge certified the record as adequate for appellate review pursuant to Rule 28(A)(1)(a), Ala. R. Juv. P.

. DHR’s report also stated that the mother had been advised to enroll in classes held at night because of her difficulty attending the other classes but that she had never enrolled in the night classes.

. The caseworker stated that she had worked with "a lot” of people whose IQs fell in the mentally retarded range before she had come to work for DHR.